IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NHAT MINH NGUYEN,

              Petitioner,              No. 2:04-cv-1829 GEB JFM (HC)

    vs.

ANTHONY KANE,

              Respondent.            <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding in propria persona with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1997 conviction on charges of first degree murder, attempted murder, and receiving stolen property, and the sentence of twenty-five years to life in prison imposed thereon. Petitioner raises seven claims that his prison sentence violates the Constitution: (1) the trial court improperly failed to instruct the jury on "target offenses," (2) the prosecutor engaged in reversible misconduct; (3) the trial court erred in admitting evidence of gang membership and other guns and ammunition not used in the charged shooting, (4) there was insufficient evidence to support petitioner's convictions, (5) the trial court erred in admitting evidence of an unredacted videotaped interview with codefendant Si Dang, (6) the trial court erred in giving jury instructions on lying in wait and transferred intent, and (7) the cumulative impact of these alleged errors required reversal.

PROCEDURAL BACKGROUND

Petitioner appealed his conviction in the California Court of Appeal, Third Appellate District.  (Answer, Appendix A.)  The Court of Appeal affirmed the conviction on May 15, 2003.  (Answer, Appendix B.)

Petitioner filed a petition for review in the California Supreme Court, raising the following claims:  (1) the trial court improperly failed to instruct the jury on "target offenses," (2) the prosecutor engaged in reversible misconduct; (3) there was insufficient evidence to support petitioner's convictions, (4) the trial court erred in admitting evidence of petitioner's gang membership, (5) the trial court erred in admitting evidence of other guns not used in the charged shooting, (6) the trial court erred in admitting evidence of an unredacted videotaped interview with codefendant Si Dang, (7) the trial court erred in giving jury instructions on lying in wait, and (8) the cumulative impact of these alleged errors required reversal.  (Appendix C.)  The petition for review was denied on October 24, 2001, without comment.  (Appendix D.)

The instant petition was filed on September 1, 2004.  Respondent filed an answer on December 2, 2004.  Petitioner filed a traverse on January 5, 2005.

FACTUAL BACKGROUND[1]

Sixteen-year old Andy Tran suffered a fatal gunshot wound to his chest as he ducked behind the couch in a friend's living room.  An adult houseguest in the home, Sen Dang, was also shot, but not fatally, during the same incident.  A jury convicted defendants Kiet Ahn Tran (Kiet), Si Van Dang (Si), Nhat Minh Nguyen (Nhat), and Len Nguyen (Len) of the first degree murder of Andy Tran (Andy) (Pen. Code, § 187)[2] and the attempted murder of Sen Dang (§§ 664/187).[3]

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Kiet Tran, et al., No. C027927 (May 15, 2003), a copy of which is attached as Exhibit B to Respondent's Answer, filed December 2, 2004.

[2]  Unless otherwise designated, all further statutory references are to the Penal Code.

[3]  Because several defendants, the deceased, and some witnesses have identical surnames, for clarity and out of no disrespect, [the court] shall refer to the defendants and the deceased by their first names.

(People v. Tran, et al., slip op. at 1.)

## I. The Shooting and Its Aftermath

At the time of these events, both defendant Len and the victim, Andy, were students at Plaza Robles High School, a continuation high school. Len attended the first daily session, which ended at 10:15 each morning, and Andy attended the second session, which began at 10:25 a.m.

Andy was a close friend of Cuong Phan's. Cuong Phan lived with his family across the street from the school, and Andy often went to his house (the Phan house) before or after school. Although Len had also visited the Phan house, Cuong Phan observed that Len and Andy did not get along.

On March 6, 1996 -- the day before the shooting -- shortly after the first session of the high school, Len and Andy got into a fight outside the Phan house after Andy told Len to shut the door to the house and Len failed or refused to do so. The fight did not last long. And when it was over, Cuong Phan's cousin took Len home.[4]

Len immediately contacted defendant Si and reported that he had experienced a problem with Andy. All four defendants then went to the Phan house, searching for Andy and Cuong Phan, but neither were there.

The next morning, Si called defendants Kiet and Nhat to wake them, picked them up at their respective homes, and drove them to the Phan house, where they arrived about 10:10 a.m. Cuong Phan was inside with his family, his parents' friend Sen Dang, and his friends Phillip Nguyen and Huy Vo. Si approached the Phan house and knocked on the front door. When no one answered, Si returned to his parked car and stood smoking and talking with Kiet and Nhat.

A few minutes later, Si, Kiet, and Nhat saw Andy's mother drop him off for the second school session. Passing a short distance from where the three defendants then stood, Andy approached the Phan house, knocked, and was admitted.

Si waited for Len. As the first school session ended, Len approached the other defendants standing near Si's car. The four appeared to talk seriously for a moment. Then, Si, Nhat, and Kiet took off their jackets and put them into the car, and all of the defendants approached the Phan house. Cuong Phan testified at

/////

---

[4] Cuong Phan's cousin was Tang Tran, also called Tyrone. Another defendant, Si, visited Tang Tran at the Phan house several times.

trial that through a window, he saw that Si and two others were approaching the house.

Suddenly, the front door opened.  Testimony was in conflict as to whether defendants knocked on the door and were admitted by someone inside the house, or merely let themselves in.  In any event, defendants stepped into the living room entry or stood just outside the entry as Cuong Phan, Andy, Phillip Nguyen, and Huy Vo simultaneously entered the living room from the hall.[5] Sen Dang was also in the living room, having slept the night on the couch.

A witness across the street from the Phan house testified that as defendants entered the house, they "threw up" their hands in a quick gesture, as if to indicate that they were "calling someone out . . . to fight."

Cuong Phan told Si to "[g]et the fuck out of my house."  Si responded, "[F]uck you," and asked Kiet for the gun.  Kiet pulled a black handgun from his waistband and handed it to Si; Si started shooting in Andy's direction.  Andy ducked behind the couch, but was killed by a bullet that pierced the couch and went through his chest.  Once struck by the bullet, Andy fell face down onto the floor.  Sen Dang was hit near the left ankle by a bullet.

Witnesses in the house testified that Si began shooting immediately or within five seconds of his exchange with Cuong Phan.  Witnesses across the street likewise testified that Si started shooting "right away" after entering the house at virtually the same moment that the door opened.  Those who heard or saw the shots generally agreed that all of the shots were fired from the vicinity of the front door, although testimony on the number of shots fired varied from between three and five to eight.

Defendants ran to Si's car, but it failed to start.  They accordingly fled on foot.  Cuong Phan appeared to give chase, but quickly returned to the house.  Some witnesses testified that Cuong Phan had no gun and that his hands were empty.  However, Si claimed that Cuong Phan had a gun as he chased defendants and claimed that he heard gunshots.

---

[5]  Testimony at trial about which of the four defendants were in the house was somewhat in conflict.  Cuong Phan and Huy Vo testified that only three defendants - Si, Nhat, and Kiet - were in the house.  But students waiting across the street for the second session to begin saw defendants approach the house, and anticipating a fight, watched to see what would happen.  One such student saw all four defendants enter the house, led by Si and Len.  Si also testified that Len was in the house with him.

Responding quickly to the 911 call from the Phan house,[6] police recovered a total of five spent nine-millimeter shell casings from the linoleum living room entry and just outside the front door. Police also searched outside the house and around the block for other shell casings and blood, but found none.  Investigating Department of Justice criminalists concluded, based on the location of the bullet holes, that all of the shots had been fired from the direction of the front door toward the couch.

However, a single spent .380 shell casing was found behind the couch near where Andy lay after he was shot.  Both officers and criminalists observed that the casing appeared to have dust on it and concluded that it was neither recently placed there nor involved in the shooting.[7]  A criminalist also noted that there was no evidence of powder marks on the back of the couch or bullet strikes near the front door so as to suggest that the .380 shell casing had been discharged recently.  A thorough search of the Phan house after the shooting revealed no evidence of weapons or live ammunition, and officers found no weapons on Andy, Cuong Phan, Phillip Nguyen, or Huy Vo.

After hiding for a while in a neighbor's yard, defendants contacted a friend, Hung Nguyen, who picked them up in his car.

Later that day, police observed Hung Nguyen's car (in which Kiet was then the sole passenger) arrive at Si's house, where Hung Nguyen retrieved a black bag, which he put into the car's passenger compartment.  Hung Nguyen later testified that Si had asked him to "save" the bag, and that Si had agreed to pick it up the next day. The black bag contained a sawed-off shotgun without a serial number and several boxes of ammunition.  In the trunk, police also found a shotgun and a purple gym bag that contained ammunition and three more loaded guns, including a loaded nine-millimeter pistol.  In total, more than 200 rounds of ammunition were recovered from the car.

By evening on the day of the shooting, all four defendants and Hung Nguyen had been apprehended.  Police observed that Si had a small scratch on the back of his leg.

Defendants waived their Miranda[8] rights and agreed to be interviewed by police.  Nhat admitted that he was at the house during the shooting and said that his fingerprints might be on the

---

[6] The 911 call was received at about 10:18 a.m.

[7] Members of the Phan family testified that they had never seen anyone clean behind the couch.

[8] Miranda v. Arizona (1966), 384 U.S. 436 [16 L.Ed.2d 694].

gun  -- a black semiautomatic nine-millimeter pistol -- because he had carried the gun as he ran from the scene, and later hid it in a neighboring yard.  Len also admitted that he had gone to the Phan house on the morning of the shooting.  On the other hand, Kiet denied being in the house when Andy was shot; he told police that he had waited in the car while the others were inside, and ran when he heard gunfire.

The nine-millimeter pistol recovered from the purple bag in the trunk of Hung Nguyen's car proved to be the murder weapon.  And a microscopic evaluation of the nine-millimeter shell casings found at the Phan house revealed that all were fired by that pistol, including the bullet that killed Andy.

The fingerprints of Si and Nhat were recovered from Si's car outside the Phan house.  Kiet's palm print was recovered from the shotgun found in the trunk of Hung Nguyen's car.

Defendants were charged with the first degree murder of Andy (§ 187 [count 1] ) and the attempted murder of Sen Dang (§§ 664/187 [count 2] ).  Arming and personal firearm use enhancements (§§ 12022, subd. (a)(1), 12022.5, subd. (a)(1)) were alleged against all defendants except Len, against whom only an arming enhancement was alleged (§ 12022, subd. (a)(1)).  As to Si only, it was also alleged that he had inflicted great bodily harm against Sen Dang (§ 12022.7).  Hung Nguyen was charged as an accessory to murder after the fact. (§ 32 [count 3] ).

Hung Nguyen and the defendants (except for Len) were also charged with receiving a stolen nine-millimeter, semiautomatic pistol (§ 496, subd. (a) [count 4] ), and Kiet, Len, and Hung Nguyen were charged with other weapon offenses not relevant here.

## II.  The Prosecution Theory

The prosecution's theory at trial was that defendants were members of a criminal street gang called the Mafia Asian Crew, that they believed Andy to be a member of a rival street gang, and that the shooting was a "home invasion murder" committed in retaliation for Andy's fight with Len the previous day.

In support of that theory, the prosecution introduced evidence that Nhat told a jail classification officer[9] after his arrest that he was a member of the Mafia Asian Crew (MAC) and that its members had problems with gangs (among others) named Vietnamese (or Viet) Asian Pride (VAP) and Lifetime Brothers.

---

[9]  Classification officers are charged with evaluating with whom arrestees should be housed in jail.

Nhat also said that Andy and most of the others at the Phan house were members of the Lifetime Brothers.

Si's girlfriend, Ahn Phan, told police that "Si and his friends[10] belonged to MAC" and that MAC members were having problems with members of the gang VAP.[11]

Si advised the classification officer that if he were housed in jail with members of the Lifetime Brothers or VAP, there would be trouble because Andy was a member of one of those gangs -- although not too much trouble because most of them were juveniles. Si also said that his friends might be recognized as gang members. Although Si denied gang membership for himself, when officers told him that his girlfriend had identified the gang in which he was a member, he agreed to tell the truth if they named the gang. The officer responded, "You got it. M.A.C. Sorry." And Si responded, "You got me, huh." Checking, the officer asked, "Okay, so, is that true?" And Si responded, "Yeah. No. Yeah."

A student watching the Phan house from across the street on the morning of the shooting testified that she thought there might be gunplay when the defendants suddenly appeared in a group at the Phan house because they had not "gotten along" with Andy and his friends for a long time.

Sometime before trial, Hung Nguyen pleaded no contest to the charges against him. He testified under a grant of immunity that after the shooting, Kiet had retrieved from Kiet's house the purple gym bag that was in his car trunk and which later proved to contain the murder weapon, and a long wrapped item that could have been the shotgun found in his trunk.

### III. The Defense Case

Of the defendants at trial, only Si testified. He admitted shooting Andy, but testified that he had done so in self-defense.

Si testified that immediately after he entered the Phan house, Andy confronted him with a .380-caliber automatic handgun and shot twice; one bullet grazed Si's left leg.[12] Only then, after Si turned to run out the door and yelled that Andy was shooting at him, did Kiet hand him a gun, with which Si then returned fire into

---

[10] Ahn Phan did not identify "Si's friends," but during his interview with police, Si repeatedly referred to Len as "my friend."

[11] At trial, however, Si's girlfriend denied that Si was a member of MAC.

[12] Si also testified that Andy, not Cuong Phan, said, "[G]et the fuck out of the house."

7

the house because he knew Len was "trapped" there.[13]  According to Si, he and Andy exchanged several volleys of gunfire, with Andy firing six or seven shots, and Si shooting about five.[14]  Even after Si heard a scream, Andy continued to shoot at him.  After he and the other defendants ran from the Phan house, Cuong Phan chased after them, and Si heard three or four additional shots fired at him.

At trial, Si also denied that he went to the Phan house on the day of the shooting to beat up Andy in retaliation for his having fought with Len, although he knew that there would be "more trouble" if he walked into the Phan house with Len.  He adopted his police interview statement that had gone to the Phan house that day to collect money from Cuong Phan's cousin, to protect Len, and to "escort" him home.  Of Len's dispute with Andy, Si opined that it was disrespectful for Andy to have been fighting with Len and further that it would be disrespectful to Cuong Phan's cousin were he to beat up Andy in the Phan house while the cousin was at home.

Finally, Si denied ever having been a member of MAC and said that Nhat alone among the defendants had been a member.  Si admitted, however, that he had lied to police during his interview about who shot Andy.

In support of the theory that Si shot Andy in self-defense, Nhat introduced the testimony of Ben Schiefelbein, a Ph.D. in chemistry, who testified that he found four particles on Andy's right hand containing elements that are unique to gunshot residue and four particles on his left hand that are consistent with, but not unique to, gunshot residue.  Under cross-examination by the prosecutor, however, Schiefelbein acknowledged that Andy had not fired a gun because, had he done so, more particles would have been found on his hands.  The presence of so few particles on Andy's hand could be explained, in Schiefelbein's opinion, by the fact that several gunshots in a relatively small room could produce a "cloud of gunshot residue," which would "settle on everything," including Andy's hands.

Another forensic scientist, Michelle Fox, did not examine evidence from the scene, but testified on Nhat's behalf that the number of particles found is not generally significant to an analysis of the presence of gunshot residue and that gunshot residue can

/////

---

[13]  Si denied knowing in advance that Kiet had a gun and denied ever having held a gun before.

[14]  With the exception of the bullet that grazed his leg, Si testified that all of Andy's shots went through the open front door.

deposit on someone's hand only if the gun is fired within a few feet of the person.

Anticipating Si's assertion that he had been shot by Andy, the prosecutor introduced the following evidence:  None of the boys running from the scene were observed limping; the pants that Si had been wearing had no bullet hole; Si's girlfriend had told police that Si did not report that he had been shot, which he would have done had it happened; and the wound on Si's leg was a mere scratch, similar to one found on Kiet's wrist after his arrest.

Finally, the defense introduced evidence from one neighbor who testified that on the day of the shooting she saw three or four boys running, and one other boy, who appeared to be chasing the others and holding a gun.  Thereafter, she heard one or two gunshots, although she saw no one shoot.

### IV.  The Convictions

The jury convicted defendants of the first degree murder of Andy, for which each defendant subsequently received a sentence of 25 years to life, and of the attempted murder of Sen Dang, for which each defendant received a concurrent sentence of seven years.  The jury also found that in committing these offenses, Si and Kiet were personally armed with a firearm (§ 12022, subd. (a)(1)) and that Si both personally used a firearm (§ 12022.5, subd. (a)(1)) and intended to inflict great bodily injury upon Sen Dang (§ 12022.7, subd. (a)).

(People v. Tran, et al., slip op. at 4-15.)

## ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

/////

1    Under section 2254(d)(1), a state court decision is "contrary to" clearly

2 established United States Supreme Court precedents if it applies a rule that contradicts the

3 governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

4 indistinguishable from a decision of the Supreme Court and nevertheless arrives at different

5 result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

6 (2000)).

7    Under the "unreasonable application" clause of section 2254(d)(1), a federal

8 habeas court may grant the writ if the state court identifies the correct governing legal principle

9 from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

10 prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ

11 simply because that court concludes in its independent judgment that the relevant state-court

12 decision applied clearly established federal law erroneously or incorrectly. Rather, that

13 application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

14 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

15 question, is left with a 'firm conviction' that the state court was 'erroneous.'") The court looks

16 to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza,

17 297 F.3d 911, 918 (9th Cir. 2002).

18 II.  Petitioner's Claims

19    A.  First Claim

20    Petitioner's first claim is that the trial court erred in failing to give jury

21 instructions on "target offenses" for purposes of first degree murder liability as an aider and

22 abetter under the "natural and probable consequences" doctrine.  (Pet. at 1-3.)

23    Respondent argues that the state court's resolution of this claim was reasonable

24 under Schad v. Arizona, 501 U.S. 624, 636 (1991)(in evaluating whether Arizona's definition of

25 first degree murder as a single crime which included both premeditated murder and felony

26 murder was unconstitutional, court held where "a State's courts have determined that certain

1  statutory alternatives are mere means of committing a single offense, rather than independent

2  elements of a crime, we simply are not at liberty to ignore that determination and conclude that

3  the alternatives are, in fact, independent elements under state law.")  Respondent contends this

4  court may not ignore California's determination that the general rules of accomplice liability,

5  such as the description and identification of target crimes under the natural and probable

6  consequences doctrine, are not elements of the crime of murder.  People v. Prettyman, 14 Cal.4th

7  248, 271 (1996).  Thus, the state court was not required by the federal constitution to instruct the

8  jury on specific target crimes under California's natural and probable consequences doctrine, and

9  the trial court's failure to so instruct was error only if "there is a reasonable likelihood that the

10  jury has applied the challenged instruction in a way that violates the Constitution."  Estelle v.

11  McGuire, 502 U.S. 62, 72 (1991).

12          The last reasoned rejection of this claim is the decision of the California Court of

13  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

14  claim on the ground that:

15                          A.  Failure to Instruct on Target
                                Crimes Was Not Reversible Error
16

17          Defendants complain that the trial court's instruction on the
        natural and probable consequences doctrine "did not either identify
18        the target crime or define its elements." They argue that "the failure
        to specify and define the target offense(s) violates the federal
19        [C]onstitution if there is a reasonable likelihood that the jury relied
        on the 'natural and probable consequences' instruction to find the
20        defendant[s] guilty of a crime such as murder on the basis of
        conduct which would not naturally and probably lead to the
21        commission of that crime."

22          We agree that the trial court failed to identify the target crimes,
        but any error was harmless.
23
            As noted earlier in this opinion, "a person who aids and abets a
24        confederate in the commission of a criminal act is liable not only
        for that crime (the target crime), but also for any other offense
25        (nontarget crime) committed by the confederate as a 'natural and
        probable consequence' of the crime originally aided and abetted."
26        (Prettyman, supra, 14 Cal.4th at p. 254, 58 Cal.Rptr.2d 827, 926
        P.2d 1013.) "To convict a defendant of a nontarget crime as an

accomplice under the 'natural and probable consequences' doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a 'natural and probable consequence' of the target crime that the defendant assisted or encouraged." *(Ibid.)*

Although the jury need not unanimously agree on the target crime that the defendant aided and abetted, its members each "must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a criminal act, and that the offense actually committed was a natural and probable consequence of that act. . . . [A] conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct.  To ensure that the jury will not rely on such generalized beliefs as a basis for conviction, the trial court should identify and describe the target or predicate crime that the defendant may have aided and abetted." (*Prettyman, supra,* 14 Cal.4th at p. 268, 58 Cal.Rptr.2d 827, 926 P.2d 1013, fn. omitted.)

Such identification of the target crime "facilitate[s] the jury's task of determining whether the charged crime allegedly committed by the aider and abettor's confederate was indeed a natural and probable consequence of any uncharged target crime that, the prosecution contends, the defendant knowingly and intentionally aided and abetted." (*Prettyman, supra,* 14 Cal.4th at p. 267, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

However, although the erroneous failure to identify and define the potential target offenses renders the instruction ambiguous, the error is not grounds for reversal under the federal Constitution unless there is a reasonable likelihood the jury " misappl[ied] the doctrine" (*Prettyman, supra,* 14 Cal.4th at pp. 272-273, 58 Cal.Rptr.2d 827, 926 P.2d 1013; *People v. Lucas* (1997) 55 Cal.App.4th 721, 731, 64 Cal.Rptr.2d 282) or, for purposes of state law, unless it is reasonably probable the trial outcome would have been different absent the error (*id.* at p. 274, 64 Cal.Rptr.2d 282).

In this case, the jury was instructed in partial compliance with the 1992 revision of CALJIC No. 3.02 (1992 rev.) (5th ed.1988) as follows: "One who aids and abets the other in the commission of the crime or crimes is not only guilty of those crimes but is also guilty of any other crime committed by a principal[,] which is a natural and probable consequence of the crime or crimes originally aided and abetted. [¶] You must determine whether a defendant is guilty of the crimes originally contemplated[,] and, if so, whether

/////

the crimes charged in Counts 1 and 2 were a natural and probable consequence of the originally contemplated crime."[15]

The instructions neither identified nor defined the potential target offenses.[16]  Defendants' objection to the instruction was timely.

But the failure to specify a target crime was not prejudicial because there is little likelihood that the jury would have misapplied the doctrine.  In *Prettyman, supra,* 14 Cal.4th 248, 58 Cal.Rptr.2d 827, 926 P.2d 1013, our Supreme Court explained that the failure to identify and describe the target crime created a risk that the target was based on noncriminal nefarious conduct (*id.* at p. 268, 58 Cal.Rptr.2d 827, 926 P.2d 1013) or "that the jury might engage in unguided speculation" and misapply the instruction (*id.* at p. 272, 58 Cal.Rptr.2d 827, 926 P.2d 1013).  But in this case, there was no reasonable likelihood that the jury misapplied the doctrine for three reasons.

First, there was no risk that the jury relied on noncriminal behavior as the target offense, notwithstanding defendants' contentions that the jury might have done so.  The trial court instructed the jury to determine whether the crimes charged "were a natural and probable consequence of the *originally contemplated*

---

[15]  Although the 1992 version was endorsed in *Prettyman* as a correct model (*Prettyman, supra,* 14 Cal.4th at p. 268 & fn. 8, 58 Cal.Rptr.2d 827, 926 P.2d 1013), the variation given by the trial court did not identify the target crime and was abbreviated in the same fashion as the 1988 version (while nonetheless using the language of the first paragraph of the 1992 version). The currently recommended text of CALJIC No. 3.02 (2000 re-rev.) (6th ed.1996) has been expanded and states in relevant part (brackets, parentheses and blanks in original):  "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted.  [¶]  In order to find the defendant guilty of the crime[s] of _____, [as charged in Count[s] _____,] you must be satisfied beyond a reasonable doubt that:  [¶]  1. The crime [or crimes] of _____ [was] [were] committed;  [¶]  2.  That the defendant aided and abetted [that] [those] crime[s];  [¶]  3. That a co-principal in that crime committed the crime[s] of _____; and [¶] (4) The crime[s] of _____ [was] [were] a natural and probable consequence of the commission of the crime[s] of _____. [¶]  [You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of _____ (charged crime) was a natural and probable consequence of the commission of that target crime].  [¶] . . . ."

[16]  The instruction originally proposed by the prosecution identified assault with a deadly weapon as the target offense, in contemplation of the court permitting the prosecution to amend the information to add a count charging all defendants with that offense.  But defense counsel objected to the instruction.  And the trial court denied the prosecutor's motion to amend.  No new definition of a target offense was proposed by the parties.

13

*crime.*" (Italics added.) Thus, the jury would not have applied noncriminal behavior as the basis for such a finding. (See *Prettyman, supra,* 14 Cal.4th at p. 273, 58 Cal.Rptr.2d 827, 926 P.2d 1013.) Although defendants argue that the jury might have relied on "gang retaliation" as the target offense, as suggested by the prosecutor, the only such retaliation here would have been a criminal act--an assault upon Andy. Thus, we are confident the jurors would have relied on a crime as the target offense. We hasten to add that in the context of gang rivalry, courts have had little difficulty in concluding that assaults can naturally and reasonably foreseeably escalate into a shooting, regardless of whether any particular defendant knew the principal intended to use a gun. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1055-1056, 88 Cal.Rptr.2d 482; see *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10, 104 Cal.Rptr.2d 247.)

Second, having found defendants guilty of the first degree murder of Andy, it is highly improbable that the jury would have based the originally contemplated (target) crime on anything other than that offense. (Cf. *People v. Montano, supra,* 96 Cal.App.3d at pp. 225-227, 158 Cal.Rptr. 47.) That, after all, was the only other crime found by the jury against defendants. Under the circumstances here, with Si's shooting in a crowded room with the intent to kill Andy, it seems obvious that the attempted murder of Sen Dang was necessarily the natural and probable consequence of the first degree murder of Andy.

Finally, as for any potential misapplication of CALJIC No. 3.02 to the murder of Andy, it is highly unlikely that the jury found that Andy's premeditated and deliberate murder itself was the natural and probable consequence of any target crime, including assault (although it legally could have in the context of gang rivalries (*People v. Montes, supra,* 74 Cal.App.4th at pp. 1055-1056, 88 Cal.Rptr.2d 482)) because the jury was instructed that it should use simple assault only as a lesser included offense for attempted murder and the murder happened much too quickly for the jury to view the murder as a natural escalation of any assault.

This case is distinguishable from *People v. Hickles* (1997) 56 Cal.App.4th 1183, 66 Cal.Rptr.2d 86, cited by Len and Nhat. There, "the conflicts in the evidence were such that it [could not] be said the only target offense shown by the evidence was one that would support a murder conviction under the natural and probable consequences doctrine." (*Id.* at pp. 1195-1196, 66 Cal.Rptr.2d 86.) In contrast, here, the jury's verdict shows that it determined that defendants had premeditatedly and deliberately intended to kill Andy, and the wounding of Sen Dang was necessarily the natural and probable consequence of shooting in a crowded room to kill Andy.

/////

14

1
2
3
4

      Accordingly, we do not believe that there is a reasonable
likelihood that the jury misapplied the doctrine.  Nor is it
reasonably probable that the trial's outcome would have been
different in the absence of the trial court's instructional error.
(*Prettyman, supra,* 14 Cal.4th at p. 274, 58 Cal.Rptr.2d 827, 926
P.2d 1013; see *People v. Watson, supra,* 46 Cal.2d at p. 836, 299
P.2d 243.)

5    (<u>People v. Tran</u>, et al, slip op. at 63-70.)

6          The state appellate court's interpretation and analysis of the "natural and probable

7    consequences" doctrine, a state court construct, may not be challenged in this federal habeas

8    corpus action.  State courts are "the ultimate expositors of state law," and this court is "bound by

9    the state's construction except when it appears that its interpretation is an obvious subterfuge to

10   evade the consideration of a federal issue." <u>Peltier v. Wright</u>, 15 F.3d 860, 862 (1994) (quoting

11   <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691 (1975) (construing state court judgment)).  <u>See</u> <u>also</u>

12   <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir. 1989) (construing state statute); <u>Melugin</u>

13   <u>v. Hames</u>, 38 F.3d 1478, 1482 (9th Cir. 1994) (construing state criminal statute).  There is no

14   evidence of subterfuge here.  However, a "claim of error based upon a right not specifically

15   guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief

16   where its impact so infects the entire trial that the resulting conviction violates the defendant's

17   right to due process." <u>Hines v. Enomoto</u>, 658 F.2d 667, 673 (9th Cir. 1981) (citing <u>Quigg v.</u>

18   <u>Crist</u>, 616 F.2d 1107 (9th Cir. 1980)).  <u>See</u> <u>also</u> <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941);

19   <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999).  In order to raise such a claim in a federal

20   habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of

21   justice." <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962).

22         The trial court instructed the jury on aiding and abetting and liability for natural

23   and probable consequences, as follows:

24         AIDING AND ABETTING - DEFINED

25         A person aids and abets the commission or attempted
      commission of a crime when he or she,

26

1        1.  With knowledge of the unlawful purpose of the perpetrator and

2

3        2.  With the intent or purpose of committing or encouraging or facilitating the commission of the crime; and

4        3.  By act or advice aids, promotes, encourages or instigates the commission of the crime.

5

6        A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime.

7

8        Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

9

10       Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

11   PRINCIPALS - LIABILITY FOR NATURAL AND PROBABLE CONSEQUENCES

12

13       One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime or crimes originally aided and abetted.

14

15       You must determine whether a defendant is guilty of the crimes originally contemplated, and if so, whether the crime charged in Counts I or II were a natural and probable consequence of the originally contemplated crime.

16

17

18   (CT 1348-49.)

19       Petitioner has failed to demonstrate a due process violation.  As explained by the

20   state appellate court, the record reflects that petitioner and two or three other men entered Cuong

21   Phan's home with the understanding that Len and the others would assault the victim.  Under

22   these circumstances, petitioner's conviction of aiding and abetting first degree murder and

23   attempted murder does not constitute a complete miscarriage of justice.

24       As explained by the California Court of Appeal, the instruction on "natural and

25   probable consequences" did not instruct the jury that it must find a certain mental state if the

26   specified factors were proven.  Rather, the thrust of the instruction was that the jury could not

1  render a guilty verdict unless the specified factors were established.  The instruction merely

2  allows, but does not require, the jurors to make a guilty finding if they found the underlying

3  factors true.  It did not instruct the jurors to infer intent or any other element of the crime charged

4  against petitioner.  This court also notes that petitioner's jury was instructed that a defendant

5  could not be found guilty unless the prosecution proved him guilty beyond a reasonable doubt.

6  (CT at 1346.)  Accordingly, the instructions at petitioner's trial, considered together, did not

7  permit a rational juror to believe that intent could be found without proof by the prosecution of

8  all elements beyond a reasonable doubt.

9          Petitioner appears to be arguing that he was denied due process because the

10  instruction on "natural and probable consequences" allowed the jurors to convict him of murder

11  or attempted murder even though they may have found that he did not act with the requisite

12  intent to aid and abet those crimes.  However, the jury instructions belie that assertion.  If the jury

13  believed petitioner's testimony/defense, then it could not have found him guilty of aiding and

14  abetting assault under the instructions given.  The instructions required the jury to find, among

15  other elements, that petitioner:  (1) had knowledge of Len's unlawful purpose, (2) had intent to

16  encourage or facilitate the commission of the crime, and (3) aided, promoted or encouraged (by

17  act or advice) the commission of the crime.  (CT at 1348.)  Therefore, the guilty verdict

18  unambiguously indicates that the jury concluded petitioner intended to encourage or facilitate the

19  commission of the target crime.  See Solis v. Garcia, 219 F.3d 922, 927-28 (9th Cir. 2000).  In

20  addition, as noted by the Court of Appeal, the facts of this case did not give rise to a finding of

21  negligence.  Accordingly, this court need not decide whether the "natural and probable

22  consequences" doctrine would have application to a case involving mere negligence.  Raines,

23  363 U.S. at 21.

24          For all of the reasons explained above, the opinion of the California Court of

25  Appeal with regard to petitioner's claim of jury instruction error is not contrary to or an

26  /////

17

1 unreasonable application of federal law, nor is it based on an unreasonable determination of the

2 facts of this case.  Accordingly, petitioner is not entitled to relief on his first claim.

3      B.  Second Claim

4      Petitioner's second claim alleges that the "prosecutor's repeated and wide-ranging

5 misconduct was so pervasive as [to] infect the trial with such unfairness as to make [petitioner's]

6 conviction a denial of his Fourteenth Amendment right to due process." (Pet. at 14.)  As

7 respondent points out, petitioner provided no factual basis for this claim, and argues this claim

8 should be summarily denied.  The traverse did not rectify petitioner's failure to articulate facts in

9 support of this claim, but simply referred the court to his state court filings.  The facts underlying

10 the misconduct claims petitioner included in his petition for review before the California

11 Supreme Court relate to the prosecutor's comments during closing argument.  (Appendix C, at

12 12-17.)  Thus, this court will only address those claims.

13      The last reasoned rejection of this claim is the decision of the California Court of

14 Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

15 claim on the ground that:[17]

16      Defendants contend that the prosecutor committed numerous acts
of misconduct.[18]

17

18      The applicable federal and state standards regarding prosecutorial
misconduct are well established.

19      Improper remarks by a prosecutor can " 'so infect[ ] the trial with

20 unfairness as to make the resulting conviction a denial of due
process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91
L.Ed.2d 144, 157]; *Donnelly v. DeChristoforo* (1974) 416 U.S.

21

22     [17]  This court is only including the state court's ruling on the misconduct issues presented
by petitioner to the California Supreme Court.

23

24     [18]  Len makes various allegations of prosecutorial misconduct but fails to specify each
claim in a subheading. Instead, he simply categorizes them as "misconduct outside the presence
of the jury" and "misconduct in the presence of the jury," which he further divides into

25 misconduct "during examination of witnesses" and "during argument."  Thus, it is difficult to
determine if some of the discussion in these sections is cited for background or as a separate

26 claim. We will therefore only address those allegations that he makes clear are claims.

637, 643 [40 L.Ed.2d 431, 437]; *People v. Frye* (1998) 18 Cal.4th 894, 969, 77 Cal.Rptr.2d 25, 959 P.2d 183 (*Frye*).)

But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' [Citation.]" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215, 40 Cal.Rptr.2d 456, 892 P.2d 1199; *People v. Hill* (1998) 17 Cal.4th 800, 819, 72 Cal.Rptr.2d 656, 952 P.2d 673 (*Hill*).) "The defendant generally need not show that the prosecutor acted in bad faith or with appreciation of the wrongfulness of his or her conduct, because the prosecutor's conduct is evaluated in accordance with an objective standard." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1333, 65 Cal.Rptr.2d 145, 939 P.2d 259 (*Bradford II*).)

"Nevertheless, as a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request an admonition to cure any harm." (*Frye, supra*, 18 Cal.4th at p. 969, 77 Cal.Rptr.2d 25, 959 P.2d 183; *People v. Monteil* (1993) 5 Cal.4th 877, 914, 21 Cal.Rptr.2d 705, 855 P.2d 1277 [although trial counsel objected to prosecutor's remarks at trial, the failure to request an admonition failed to preserve a claim of prosecutorial misconduct on appeal]; *People v. Gionis, supra*, 9 Cal.4th at p. 1215, 40 Cal.Rptr.2d 456, 892 P.2d 1199.)

The rule that a defendant must object and request an admonition at trial in order to preserve the issue for appeal, however, "applies only if a timely objection or request for admonition would have cured the harm." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1184, fn. 27, 259 Cal.Rptr. 701, 774 P.2d 730.) Accordingly, the rule is not applicable where any objection by defense counsel would almost certainly have been overruled. (*Ibid.*) Likewise, where such an objection is overruled, failure to request an admonition is excused because there is no opportunity to do so. (*People v. Green, supra*, 27 Cal.3d at p. 35, fn. 19, 164 Cal.Rptr. 1, 609 P.2d 468.)

. . .

(*People v. Tran, et al.*, slip op. at 75-77.)

### B. Alleged Misconduct Committed Before the Jury

. . .

2. <u>Alleged misconduct during closing argument.</u>

/////

Defendants claim that "[p]erhaps the most egregious misconduct occurred during closing arguments."

" ' "It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature."  [Citation] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets. . . .' " ' [Citation.]" (*Williams III, supra,* 16 Cal.4th at p. 221, 66 Cal.Rptr.2d 123, 940 P.2d 710; *People v. Dennis* (1998) 17 Cal.4th 468, 521, 71 Cal.Rptr.2d 680, 950 P.2d 1035; see also *People v. Sandoval* (1992) 4 Cal.4th 155, 180, 14 Cal.Rptr.2d 342, 841 P.2d 862 ["Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence"].)

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]  In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*Frye, supra,* 18 Cal.4th at p. 970, 77 Cal.Rptr.2d 25, 959 P.2d 183; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 841, 64 Cal.Rptr.2d 400, 938 P.2d 2.)

In accordance with these principles, we conclude that the claimed instances of misconduct were not prejudicial.

a. <u>References to gangs</u>.

Defendants complain that "the prosecutor repeatedly discussed gang violence on television, movies, and on the streets of Los Angeles, comparing the defendants to Mafia hit men."

In his closing argument, the prosecutor reiterated his theory that Andy's shooting was a gang retaliation, and in so doing, he drew objections from defense counsel as set forth below:

"[THE PROSECUTOR]:  Is it foreseeable that when gang retaliation-based upon our common experiences and what we see every day in the newspapers and on television that gang retaliation results in someone dying?

"[COUNSEL FOR LEN]:  That's clearly improper.  [¶]  Ask the Court to admonish him as to using other cases and instances, what

the jurors have read in the newspaper, in order to convict these individuals.

"THE COURT:  Sustained.  [¶]  Limit it to arguing this case, counsel.  [¶] . . . [¶]

"[THE PROSECUTOR]:  Why is their gang called [the Mafia Asian Crew]?  Because, one, they idolize the Italian crime syndicate.  They want to be like them.  They want control.

"[COUNSEL FOR NHAT]:  I object.  This is designed to inflame the passions of the jury.

"[COUNSEL FOR KIET]:  He's invoking the connotations.  It's probably an insult to the Italian-American on the jury I'm sure.

"THE COURT:  If so, I'll be insulted. Overruled.

"[THE PROSECUTOR]:  Doesn't the Mafia use hit men and use-is there an objection?

"[COUNSEL FOR LEN]:  Yes, there is.

"[THE PROSECUTOR]:  Go figure. Imagine that.

"THE COURT:  State your grounds.

"[COUNSEL FOR LEN]:  It's improper argument for him to try to compare that things that go on in the world to specifics of this case.  He's supposed to stick to the evidence and comment on his theory as to what this evidence is.

"[COUNSEL FOR KIET]:  He's going to mention Charles Manson in a few minutes or Hitler.  He's gone beyond the pale, Your Honor.

"THE COURT: Stop arguing and state the grounds.

"[COUNSEL FOR KIET]:  Misconduct and improper argument by the prosecutor who has a higher duty to argue the case in good faith and prosecute the case in good faith.

"THE COURT: You've stated your grounds.  [¶]  I would direct the District Attorney to be specific to the facts of this case.  [¶] Objection sustained.

"[THE PROSECUTOR]: Has anyone heard of the Mafia? I think so.  Hit man or rub out an enemy?  [¶]  Have you ever heard of the Mafia-

/////

21

1      "[COUNSEL FOR LEN]: You just sustained the objection to
the that [ sic ] line of inquiry.

2

       "THE COURT: Yes, I did.

3

       "[COUNSEL FOR KIET]:  He just did it again.

4

       "THE COURT:  Mr. Freitas [the prosecutor], limit yourself to
5    facts in this case.

6      "[COUNSEL FOR KIET]:  Thank you.

7      "[COUNSEL FOR NHAT]:  I ask for a citation of misconduct.

8      "[COUNSEL FOR KIET]:  He's getting ready to do it one more
time.

9

       "THE COURT:  I'll take it up at the break out of the presence of
10   the jury.

11     "[THE PROSECUTOR]:  Why do you think they call
themselves the Mafia Asian Crew?  There's a reason they call
12   themselves the Mafia Asian Crew.  Doesn't it show what their
[intent] was when they were over at [the Phan house]?  They
13   weren't there to collect any $40.  Make no mistake about it.
When-if you were there to collect $40 and you bring this, that is
14   robbery.  That's a crime.

15     "How do we know the defendants are gang members? Look
what the evidence has been. We have Nhat's uncontradicted
16   self-admission that he claimed the Mafia Asian Crew to Deputy
Morales.

17
       "Also we have Si's admission to Detective Salsedo when he
18   says[,]['] You got me.[']  He then attempts to cover it up and say
different things.  But the fact of the matter is he said[,]['] You got
19   me.[']  He is a member of the Mafia Asian Crew.

20     "Also his girlfriend for a year or eight months at the time of
this, she identifies him as a member. And not only does she
21   identify him, but she also identifies his friends as being members
of this Mafia Asian Crew. . . . [¶] . . . [¶]
22
       "And when they went over there, it was solely for the rivalry as
23   described by Anh Phan to Detective Salsedo, to get retaliation
upon a person they believed to be a rival gang member.

24
       "When you look at gangs, you're really looking at three R's.
25   That's rivalries, respect and retaliation. And we know even on
West Side Story, the academy award-winning film, that these
26   /////

                                 22

gangs have rivalries, and these rivalries are-in fact, can be caused by the second R, respect, lack of respect.

"And we've seen in the news that a family driving on the wrong street in L.A. was shown to be disrespectful, and-

"[COUNSEL FOR LEN]: That's what he can't do. That's improper to try to-

"[THE PROSECUTOR]: Yes.

"[COUNSEL FOR LEN]: No, you can't. You don't know what you're doing. [¶] Improper argument. He's trying to inflame the jury. I ask for a mistrial based on his continued conduct.

"THE COURT: Mistrial is denied. [¶] Disregard anything that happened in L.A.

"[COUNSEL FOR LEN]: Thank you. At least it's on the record. [¶] The last objection was sustained, right, Your Honor?

"THE COURT: Yes, counsel. [¶] Proceed, Mr. Freitas [the prosecutor].

"[COUNSEL FOR NHAT]: I would seek a citation of misconduct?

"THE COURT: Denied."

In rebuttal, the prosecutor reprised his theme:

"[THE PROSECUTOR]: We're a gang called the Mafia Asian Crew. Now, have you ever heard about the Mafia doing hits, the Mafia having retaliation, the Mafia rubbing out [its] enemies and using guns? Have you ever heard of Mafia hit men? Isn't this what this evidence is about? [¶] . . . [¶]

"And what do we know about these rivalries? We've heard [Counsel for Kiet]'s eloquent speech about the movie The Killing Fields, walking over bones to get out of Vietnam, the fighting to get on a helicopter, landing on a ship.

"What do we know about these rivalries? While you were seeing the movie of The Killing Fields, did they happen to have another movie called Colors or American Me or how about a movie called M[i] Vida Loc[a]? How about a movie called Boy[z]['N] the Hood?

"How about while you were at the movie theater, were there gang members there and staring at you? Were they in a pack?

"When you go shopping at the mall, do you see them walking? Do you see them jostling?  Do you see them disrupting business?

"What do we know about gang members?  We know they congregate. We know they have rivalries.  We know there's red people, blue people, no color people.

"Do we know that they retaliate?  What do we see?  For the slightest amount of disrespect or for merely being a rival[,] retaliation is exacted.

"And what type of retaliation?  Immediate, escalating – and by escalating I mean if you hit me, I stab you.  If you stab me, I shoot you or maybe it skips all the way up.

"What do we know about disrespect?  We know it can be driving down the wrong street in Los Angeles.  It can be right over here on March Lane pointing to somebody saying, [']Your high beams are on,['] and that's misinterpreted as a rival gang sign.  And you're hunted down and shot in the back in your car with a MAC 10.

"[COUNSEL FOR NHAT]: I object, Your Honor.  That's not this case.

THE COURT:  Objection is noted and overruled.  [¶]  You may complete your argument."

To the extent defendants base their assignment of misconduct on the claim that it was improper for the prosecutor to argue that all defendants were gang members, it has no merit.  There was sufficient evidence in this case from which a reasonable trier of fact could infer that Andy's killing was motivated by his perceived disrespect for Len, who associated himself with a rival gang, and that the defendants who carried out the retaliation were affiliated with the Mafia Asian Crew.  After all, Nhat admitted that he was a member of the gang, Si at one point acknowledged that he was a member, and Si's girlfriend said that "Si and his friends belonged to MAC."

Nor was it misconduct for the prosecutor to characterize MAC as a "criminal street gang" without having earlier established that phrase within the meaning of section 186.22.  The defendants were not charged under section 186.22.  It is therefore likely that the jury understood the prosecutor, by his use of that phrase, to be arguing that persons affiliated with MAC engaged in unlawful conduct, such as the crimes with which defendants were charged, and the maintenance of an arsenal of ammunition and weapons.

Defendants contend that the prosecutor's repeated efforts to analogize MAC to popular images of the Italian Mafia-including

24

his references to "hit men" and "rubbing people out"-were improper appeals to the jury's passions, designed to "invoke[ ] the specter of gang violence," and invitations to find defendants guilty based on facts outside the record.  While the court could have exercised its discretion to bar such comments, we are unpersuaded that it is reasonably likely that the jury understood the challenged comments in an improper or erroneous manner.  (*Frye, supra,* 18 Cal.4th at p. 970, 77 Cal.Rptr.2d 25, 959 P.2d 183.)  In all likelihood, the jury understood those references to be an effort to invoke such permissible " ' "illustrations drawn from common experience, history or literature." ' "  (*Williams III, supra,* 16 Cal.4th at p. 221, 66 Cal.Rptr.2d 123, 940 P.2d 710.)  Surely, jurors would not have believed that MAC was the mafia.  And we cannot help but note that defendants' weapons arsenal and their crime of spraying gunfire in a private home, combined with their choice of a gang name that used the term "Mafia," had an aura of the Mafia, as portrayed in popular culture.  Thus, the analogy was not inapposite.

We do agree with defendants that the trial court should have sustained the second objection to the prosecutor's reference to driving down the wrong street in Los Angeles, but the reference could not have been prejudicial.

Finally, we reject defendants' challenge to the prosecutor's assertion in closing argument that Len was a gang member.  The prosecutor was entitled to argue that Len was a gang member from the admissible evidence that Len was one of Si's friends, that Si's girlfriend reported that Si and his friends were members of MAC, and that gang members accompanied Len to search for Andy after his fight and the following day.

. . .

    e.  <u>Appealing to jurors' fears and sympathies</u>.

. . .

    (ii)  <u>Appeals to jurors' fears</u>.

In discussing reasonable doubt during his rebuttal, the prosecutor made the following argument over a defense objection:

"And it's not percentages.  You heard some things about, well, 51 percent is a preponderance of the evidence, and clear and convincing is somewhere else.  [¶]  The law is not defined by percentages, but I submit this to you:  If the defendants told you they were going to kill, wouldn't you be 100 percent certain that would happen[?]  [¶]  . . . [¶]  If Si Dang said he was going to kill, wouldn't you be a hundred percent certain that would happen?  [¶] If Nhat Nguyen said he was going to kill you, wouldn't you be one

hundred percent sure he was going to kill you?  [¶]  If Kiet Tran said he was going to kill you, wouldn't you be one hundred percent certain he was going to kill you?  And Len Nguyen --"

Defendants contend that the prosecutor intended by this argument to infuse the jury members with fear for their own safety.

It is improper for the prosecutor to appeal to the passion and prejudice of the jury in closing argument during the guilt phase of trial.  (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250, 278 Cal.Rptr. 640, 805 P.2d 899; *People v. Simington* (1993) 19 Cal.App.4th 1374, 1378, 23 Cal.Rptr.2d 769.)  Rhetorical devices of the type employed by the prosecutor here have been found to be misconduct.  (E.g., *People v. Pensinger, supra,* 52 Cal.3d at p. 1250, 278 Cal.Rptr. 640, 805 P.2d 899 ["Suppose instead of being Vickie Melander's kid [the victim] this had happened to one of your children"]; *People v. Simington, supra,* 19 Cal.App.4th at p. 1379, 23 Cal.Rptr.2d 769 ["ask[ing] the jurors to place themselves in the position of an innocent victim who is assaulted with a knife and sustains serious injuries" is misconduct]; *People v. Jones* (1970) 7 Cal.App.3d 358, 363, 86 Cal.Rptr. 516 [argument "to the effect that the sons of the jurors and their girlfriends dare not ride motorcycles into an area where the appellant is located, because he reacts seriously," was "a crude appeal to the fears and emotions of the jurors"].)

Therefore, we agree that the remarks by the prosecutor here constituted an improper appeal to the passion and prejudice of the jury.  The objection, which was timely made on the ground that the remarks were improper suggestions that the defendants could pose a threat to the jurors, should have been sustained.  But we also conclude that the error was harmless. (See *People v. Pensinger, supra,* 52 Cal.3d at pp. 1250-1251, 278 Cal.Rptr. 640, 805 P.2d 899 [misconduct harmless]; *People v. Simington, supra,* 19 Cal.App.4th at pp. 1379-1380, 23 Cal.Rptr.2d 769 [same]; *People v. Jones, supra,* 7 Cal.App.3d at pp. 363-364, 86 Cal.Rptr. 516.)  It cannot be said that it is reasonably probable that a different result would have been reached in the absence of these brief remarks in the context of lengthy closing arguments.  And the prosecutor could have made the very same point about the defendants' coldheartedness in a proper fashion had the objection been sustained.

In sum, we find no denial of due process or of a fair trial as a result of any misconduct committed by the prosecutor.  The Attorney General characterizes the challenged remarks of the prosecutor as "unartful," "ill-advised," and "aggressive, if somewhat misguided" advocacy.  Although, in our view, the arguments by both sides were unduly argumentative and personal on occasion, the limited number of instances of misconduct to

/////

1        which defendants objected were not so severe as to undermine the
2        jury's fair consideration of the evidence.

3  (People v. Tran, et al., slip op. at 84; 85-96; 104; 106-08.)

4        Success on a claim of prosecutorial misconduct requires a showing that the

5  conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

6  process.  Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to determine

7  "whether, considered in the context of the entire trial, that conduct appears likely to have affected

8  the jury's discharge of its duty to judge the evidence fairly."  United States v. Simtob, 901 F.2d

9  799, 806 (9th Cir. 1990).  The right to due process is violated when a prosecutor's misconduct

10  renders a trial fundamentally unfair.  Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940 (1982)

11  ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

12  fairness of the trial, not the culpability of the prosecutor" ).

13        Generally, if an error of constitutional magnitude is determined, a harmless error

14  analysis ensues.  Error is considered harmless if the court, after reviewing the entire trial record,

15  decides that the alleged error did not have a "substantial and injurious effect or influence in

16  determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Error is

17  deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's

18  substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).

19        In the petition, petitioner set forth this claim as follows:

20        The pertinent facts about the prosecutorial misconduct are
21        summarized in the Court of Appeal opinion at pages 77-106.

22        In a trial ranked by the court as among its list of the top ten
nastiest trials, the prosecutor was cited for contempt because of his
23        "rude" and "disrespectful" behavior and chastised for demeaning
the "dignity of the honorable office he occupied."  [Petitioner]
24        argued that the numerous acts of prosecutorial misconduct infected
the trial with such unfairness that it violated his Fourteenth
25        Amendment right to due process.

26        The Court of Appeal agreed that the prosecutor committed
misconduct, but concluded the instances were limited and not so

severe as to infect the trial with unfairness. Typ. opn., pp. 86, 106. This was a close case on the determination of [petitioner's] guilt as an aider and abettor. The credibility of the defense case was severely damaged by the prosecutor's repeated misconduct, which affected the entire trial, from opening to closing argument. Given the repeated and wide-ranging misconduct of the prosecutor that went to the very heart of the case, there is a reasonable probability that the misconduct contributed to the verdicts.

The Court of Appeal erred in finding other claims of misconduct were waived because counsel did not object or did object but did not request a jury admonition. Its ruling ignores the evidence that underscored the futility of an admonition, as this was a prosecutor who repeatedly and flagrantly refused to obey the trial court's orders and was admonished for behavior that was disrespectful and contemptuous of the court. In a case where defense counsel made numerous timely objections and the prosecutor refused to honor the court's rulings sustaining them, the need for further objections and requests for admonition should be excused.

(Pet. at 3-4.) Despite respondent's argument that petitioner had failed to state facts in support of this claim, failed to identify what the prosecutor did wrong, failed to demonstrate how he was prejudiced by any such wrongdoing, or why such wrongdoing warranted the grant of habeas relief, petitioner's traverse merely referred the reader to Exhibit A to his petition, and to an unidentified memorandum of points and authorities. (Id. at 3-4.) Petitioner also re-appended Exhibit A to his traverse. (Id.)

After review of the record herein, the court finds no evidence that petitioner's due process rights were violated by prosecutorial misconduct. While the prosecutor was overzealous, contrary to petitioner's arguments in state court, the instances evidencing prosecutorial misconduct are not as strong or persuasive as petitioner contends.

The trial court sustained defense objections to the prosecutor's improper questioning of witnesses and, on some occasions, admonished the prosecutor. See, e.g. United States v. Cox, 633 F.2d 871 875 (9th Cir. 1980)(improprieties in counsel's conduct do not require a new trial unless they are so gross as to prejudice the defendant and that prejudice has not been neutralized by the trial judge). The prosecutor's closing argument spanned three days and consisted of almost 196 pages in the record. (RT 3904-45; 3950-95; 4174-234; 4237-87.)

1   Thus, the record supports the state's court finding that the errors were harmless because the

2   limited number of instances of misconduct were not so severe as to undermine the jury's fair

3   consideration of the evidence.

4           Petitioner has failed to demonstrate how the prosecutor's actions rendered his trial

5   fundamentally unfair.  See Hovey v. Ayers, 458 F.3d 892, 924 (9th Cir. 2006)(impact of

6   prosecutorial comments on the fairness of a trial evaluated according to "(1) whether the

7   prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a

8   curative instruction; and (3) the weight of the evidence against the accused.").  Petitioner has also

9   failed to demonstrate that absent the prosecutor's behavior, the verdict would have been

10  different.

11          During booking, petitioner admitted to being a member of a gang.  (RT 2324.)

12  Petitioner's co-defendant Si Van Dang also testified that petitioner was a gang member.  (RT

13  3272-74.)  Admission of this gang membership evidence allowed the jury to draw permissible

14  inferences from the gang membership evidence, see Jammal v. Van de Kamp, 926 F.2d 918, 920

15  (9th Cir. 1991).  Therefore, the prosecution's gang-related arguments were fair comments on the

16  evidence.  "The prosecution may draw reasonable inferences from the evidence during [closing]

17  argument."  Guam v. Palomo, 35 F.3d 368, 373 (9th Cir. 1994).

18          Moreover, petitioner has not demonstrated that the prosecutor's statements about

19  gangs or the Mafia during closing arguments "so infected the trial with unfairness as to make the

20  resulting conviction a denial of due process."  Darden, 477 U.S. at 171.  Here, the weight of the

21  evidence against petitioner precludes a finding that absent the prosecutor's remarks during

22  closing arguments, the outcome would have been different.  Greer, 483 U.S. at 765.  Thus,

23  petitioner is not entitled to relief on this ground.

24          The state court's rejection of petitioner's second claim for relief was neither

25  contrary to, nor an unreasonable application of, controlling principles of United States Supreme

26  Court precedent.  Petitioner's second claim for relief should be denied.

C. <u>Third Claim</u>

Petitioner's third claim is that the trial court violated his right to due process by admitting evidence of his and Si's membership in the MAC gang and in admitting evidence of guns not used in the charged shooting.  (Pet. at 4-7.)

A. <u>Admission of Gang Membership Was Not Error</u>

Defendants' gang affiliation was the subject of in limine motions by the prosecution.  The trial court ultimately excluded, as more prejudicial than probative, the proposed testimony of a law enforcement gang expert.  However, it admitted (1) evidence of defendants' statements about their own gang affiliations and that of their friends,[19] and (2) evidence that defendants believed that Andy and others at the Phan house were members of another unfriendly gang.

On appeal, defendants renew their arguments that it was error to admit evidence of their gang membership.  They contend that such evidence impermissibly suggested a propensity to commit crimes, lacked probative value, was unduly prejudicial and inflammatory, and should not have been admitted after the court rejected "the same evidence when offered in support of the expert testimony."  They also contend that their statements to the jail classification officer about gang membership were inherently unreliable or obtained involuntarily.

"Evidence of gang membership is considered prejudicial because it tends to establish criminal disposition."  (*People v. Pinholster* (1992) 1 Cal.4th 865, 945, 4 Cal.Rptr.2d 765, 824 P.2d 571.)  But notwithstanding this potentially prejudicial effect, "gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect."  (*People v. Williams* (1997) 16 Cal.4th 153, 193, 66 Cal.Rptr.2d 123, 940 P.2d 710 (hereafter *Williams III*); *People v. Champion* (1995) 9 Cal.4th 879, 922, 39 Cal.Rptr.2d 547, 891 P.2d 93; *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1497, 25 Cal.Rptr.2d 644; *People v. Contreras* (1983) 144 Cal.App.3d 749, 755-758, 192 Cal.Rptr. 810 (*Contreras I*); *People v. Yu, supra*, 143 Cal.App.3d at pp. 375-377, 191 Cal.Rptr. 859; *see also People v.*

---

[19]  Nhat admitted membership in MAC and stated that murder victim Andy had been a member of either Vietnamese Asian Pride, Midnight Players, or Lifetime Brothers, and that he had problems with those gangs.  Si's girlfriend reported to police that Si and his friends were members of MAC.  Si himself told officers that his friends were gang members and that Andy was a member of an unfriendly gang, and at one point said, "You got me," in response to officers' suggestion that he was a member of MAC.

*Frausto* (1982) 135 Cal.App.3d 129, 140, 185 Cal.Rptr. 314 [summarizing cases holding that evidence of gang membership is relevant to the issue of motive.)  Evidence of gang affiliation may also be admissible to show premeditation and deliberation. (*People v. Rand* (1995) 37 Cal.App.4th 999, 1000-1001, 44 Cal.Rptr.2d 686.)

Moreover, "[t]he admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369, 37 Cal.Rptr.2d 596.)

Here, we cannot say that the trial court abused its discretion in admitting evidence related to gang membership.  Evidence of defendants' gang affiliation and their beliefs about Andy's affiliation with a rival gang was highly relevant to the prosecution's theory of why Andy was killed.  (See *Williams III, supra*, 16 Cal.4th at p. 194, 66 Cal.Rptr.2d 123, 940 P.2d 710.)  It offered a motive for all four defendants to respond with force following a relatively minor scuffle between Andy and Len.  And the gang affiliation, and the motive it supplied, tended to suggest that the attack on Andy was premeditated and not spontaneous or the result of the heat of passion.  Finally, since the jury was instructed that a person who aids and abets another in the commission of a crime is also guilty of any other crime committed by the principal which is the natural and probable consequence of the crime pursuant to the "natural and probable consequences" doctrine (*People v. Prettyman* (1996) 14 Cal.4th 248, 262, 58 Cal.Rptr.2d 827, 926 P.2d 1013 (*Prettyman*)), evidence of gang affiliations, along with evidence of the gang's arsenal of weapons (see section B, post), was also relevant to whether murder or attempted murder could be a natural and probable consequence of an assault where committed by a gang.

Admittedly, "California courts have long recognized the potentially prejudicial effect of gang membership evidence."  (*People v. Maestas, supra*, 20 Cal.App.4th at p. 1497, 25 Cal.Rptr.2d 644.)  But all evidence, including gang membership, "which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is 'prejudicial.'  The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"  (*People v. Yu, supra*, 143 Cal.App.3d at p. 377, 191 Cal.Rptr. 859.)  It nonetheless "'is proper to introduce evidence which is even unpleasant or negative pertaining to an organization in issue which is relevant on the issue of motive or the subject matter at trial.'"  (*People v. Plasencia* (1985) 168 Cal.App.3d 546, 552, 223 Cal.Rptr. 786.)  Accordingly, when gang membership "an

31

integral and unavoidable fact relevant to . . . motive," its admission is not an abuse of discretion.  (*Ibid.*)

In this case, because the gang evidence was highly probative on the issues of intent, motive, and the natural and probable consequences doctrine, we will not overturn the trial court's exercise of its discretion.

Defendants suggest that "[t]he trial court erred in allowing the prosecution to introduce evidence of gang affiliation, after excluding expert testimony, based upon the same theory of relevance, as unduly prejudicial."  But an evidentiary ruling on an expert witness, whether right or wrong, cannot preclude a separate and correct ruling on the testimony of a lay witness.  Moreover, there was no inconsistency in the court's rulings.  As the court later clarified, it prohibited testimony from the gang expert because "the gang expert was going to rely on otherwise inadmissible evidence in making his and stating his opinions."[20]

Nor is Nhat's citation to *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 128 Cal.Rptr.2d 411, helpful to his position since that case admitted evidence regarding gang membership but merely held that the further admission of testimony about gangs' criminal tendencies was an abuse of discretion under the circumstances of that case.

We also reject defendants' contention that the trial court was required to reject as unreliable their admissions to the jail classification officer concerning gang affiliations.  The point is not well developed nor given a separate heading as required by California Rules of Court, rule 14(a)(1)(B) (and former rule 15) and thus can be ignored.  (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4, 41 Cal.Rptr.2d 263.)

In any event, "[t]o determine whether a statement was voluntary or coerced, we examine the totality of the circumstances.  [Citation.]  Coercive police activity is a necessary predicate but does not itself compel a finding that a resulting confession is involuntary."  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041, 60 Cal.Rptr.2d 225, 929 P.2d 544 (*Bradford I*).)  Not only is the record bereft of any evidence of police coercion, but defendants' statements that they did not fear potential trouble from rival gang members in jail belies their suggestion on appeal that they felt "compelled . . . to request not being housed with members [of] any gang in which [Andy] was even remotely suspected of involvement."

---

[20]  At the time the trial court excluded the expert testimony, it noted that "the danger that flows is that a lot of otherwise inadmissible evidence is placed before the jury with a proper admonition shortly following which does ... create a risk and a substantial risk."

B. <u>Evidence of Firearms Other than the Murder Weapon Does Not Require Reversal</u>

The trial court denied defendants' in limine request to exclude evidence of the various firearms found in Hung Nguyen's car, in which Kiet was a passenger, after the shooting.  Defendants complain that "[t]he trial court's admission over defense objection of the weapons and ammunition in Hung Nguyen's car that were not used in the commission of the crime was error."   They claim that it was of no relevance to the determination of their guilt or innocence and only demonstrated defendants' propensity for violence.  The claim is waived as a matter of procedure and wrong on the merits.

At the time of the defendants' unsuccessful motion in limine, defendants Si, Kiet, and Nhat were facing charges under count 4 for receiving stolen property relating to the gun used in the murder. Although defendants subsequently objected that the stolen nature of the other weapons was irrelevant, the court ruled that as long as there was a stolen weapon count, the evidence was relevant, presumably to show defendants' knowledge that the murder weapon was stolen. Defendants Si, Nhat, and Kiet then pleaded no contest to count 4.  As a result, the trial court ruled that the jury would not be told about "the alleged stolen character" of the weapons. However, the trial court did not rule that the presence of the weapons found in Hung Nguyen's car (and provided by Kiet and Si) was irrelevant, and the defendants did not renew their objections to any reference to the guns during trial.

"'Generally when an in limine ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal.' [Citations.]"  (<u>People v. Morris</u> (1991) 53 Cal.3d 152, 189, 279 Cal.Rptr. 720, 807 P.2d 949, *disapproved on other grounds* in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.)  This is because "[e]vents in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353. . . .  '[U]ntil the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility.' [Citation.]  In these kinds of circumstances, an objection at the time the evidence is offered serves to focus the issue and to protect the record." (*People v. Morris, supra*, 53 Cal.3d at p. 190, 279 Cal.Rptr. 720, 807 P.2d 949.)  "In summary, . . . a motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.:  (1) a specific legal ground for exclusion is advanced and subsequently raised on

appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*Ibid.*)

In light of the changed circumstances of the charges faced by the defendants at trial and the changing factual context of the case, defendants should have renewed their objection in order to preserve it. Indeed, Si argues in his reply brief that "[o]nce all defendants pleaded guilty to . . . count [4], there was no relevance to the evidence." But this merely highlights that changed circumstances required defendants to renew their objection after they pleaded guilty in order to preserve it.

However, even if defendants had not waived their objection, the court did not abuse its discretion in admitting evidence of the weapons provided by Si and Kiet to Hung Nguyen following the shooting.

The general rule governing the admission of evidence of weapons not used in the commission of a charged crime, as the Attorney General acknowledges, is stated in *People v. Riser* (1956) 47 Cal.2d 566, 577, 305 P.2d 1 (*overruled on other grounds* in *People v. Chapman* (1959) 52 Cal.2d 95, 98, 338 P.2d 428, and *People v. Morse* (1964) 60 Cal.2d 631, 648-649, 36 Cal.Rptr. 201, 388 P.2d 33): "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]"

But *People v. Riser, supra*, 47 Cal.2d 566, 305 P.2d 1, did not state that evidence of other weapons may never be admitted even if it is relevant to separate issues in the case. "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2, 39 Cal.Rptr. 377, 393 P.2d 689.) Indeed, although the Supreme Court ruled in *Riser* that admission of evidence of weapons, other than the murder weapon, discovered in defendant's possession several weeks following the commission of the murder, was error, the court subsequently distinguished that decision from a circumstance where an unrelated weapon and ammunition were "located in defendant's truck . . . by deputy sheriffs at the crime scene, *shortly after commission of the crimes,*

and there was no direct evidence as to the fatal shooting that would render this evidence irrelevant to establish facts material to proof of the charged offenses." (*People v. Neely* (1993) 6 Cal.4th 877, 896, 26 Cal.Rptr.2d 189, 864 P.2d 460, italics added.)  In short, a defendant's possession of unrelated weapons can be relevant depending upon the context of their discovery and the issues in the case.

In this case, the evidence that Kiet and Si had a virtual arsenal of other weapons, combined with Si's gang affiliation, made it likely that the natural and probable consequence of Si's attack on Andy would result in the use of lethal force pursuant to the natural and probable consequences doctrine.  It also allowed an inference that their friends, Nhat and Len, would know that they had weapons available for any confrontation.

In any event, even if any objection to the evidence of other weapons had not been waived and even if the evidence should have been excluded, it is not reasonably probable that a result more favorable to defendants would have been reached in the absence of the foregoing evidence.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243; *People v. Nelson* (1964) 224 Cal.App.2d 238, 255-256, 36 Cal.Rptr. 385.)  As discussed in greater detail in part III of the Discussion, post, substantial evidence demonstrates that defendants acted in concert to carry out a preconceived plan to shoot Andy in the Phan house.  The evidence also shows that defendants conferred before the shooting, that Kiet brought the murder weapon to the house, that Si used it within seconds of entering the house and killed the target of his actions, that Nhat carried the gun away from the Phan house, and that Kiet later secreted it in a bag in Hung Nguyen's car.  While evidence of defendants' gang affiliations certainly contributed to the verdict, the absence of evidence of their other weapons would not have changed it.

Si argues that any error was not harmless because "there was substantial evidence of self-defense," including gunshot residue on Andy's hands and witnesses who said that defendants were chased by a man with a gun.  This contention fails because, among other things, the evidence of self-defense was not substantial: The purported fact that defendants were chased by a man with a gun did not support a claim of self-defense because Si shot Andy before that chase.   Instead, defendants' defense was based on Andy's assault on Si.  But defendant's own expert, Ben Schiefelbein, admitted that Andy had not fired a gun because more particles would have been found on his hand if that had been the case.  Because there is no reasonable likelihood that the verdict would have been different absent evidence of the other guns, we conclude that any error was harmless.

(People v. Tran, et al, slip op. at 32-42.)

1         1. <u>Evidence of Gang Affiliation</u>

2         Petitioner claims that he was denied a fair trial based upon the admission of

3 evidence that he and his co-defendants were affiliated with gangs.  (Pet. at (5).)  Petitioner argues

4 that petitioner's co-defendants' personal ties to Len made any gang connection cumulative.  (<u>Id.</u>)

5 Petitioner also claims that the admission of the evidence of weapons and ammunition, which

6 were unrelated to the murder and cached by his co-defendant, was error.  (<u>Id.</u>)

7         "The admission of 'other acts' evidence will violate due process only when there

8 are no permissible inferences the jury may draw from the evidence."  <u>Windham v. Merkle</u>, 163

9 F.3d 1092, 1103 (9th Cir. 1998) (emphasis in original) (internal quotations and citations

10 omitted).  <u>See</u> also <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991) (same).

11         Petitioner argues that the prosecutor emphasized the gang evidence to imply guilt

12 by association in violation of <u>Kennedy v. Lockyer</u>, 372 F.3d 1013, 1028 (9th Cir. 2004)("use of

13 gang membership evidence to imply 'guilt by association' is impermissible and prejudicial.")

14 However, the <u>Kennedy</u> opinion was withdrawn from publication because it was amended on

15 denial of rehearing and rehearing en banc August 18, 2004.  <u>Kennedy v. Lockyer</u>, 379 F.3d 1041,

16 1045 (9th Cir. 2004).  Review of the amended opinion demonstrates that <u>Kennedy</u> is factually

17 distinguishable from the instant case because the prior trial court had previously excluded any

18 mention of <u>Kennedy's</u> alleged gang involvement, and the prosecution deliberately proceeded to

19 elicit testimony concerning gangs in the second trial.  <u>Id.</u>

20         Here, the gang evidence in this case was admitted to establish intent, motive, and

21 with respect to whether murder was a natural and probable consequences of the assault on Andy,

22 all of which were material issues in this case.  Thus, the state court did not err in finding the

23 evidence admissible.  <u>See</u> <u>United States v. Abel</u>, 469 U.S. 45, 49 (1984) (deciding that gang

24 membership was "sufficiently probative of . .  possible bias . . . to warrant its admission into

25 evidence.");  <u>United States v. Santiago</u>, 46 F.3d 885, 889 (9th Cir. 1995) (recognizing that gang

26 evidence is admissible as proof of motive);  <u>Nguyen v. Runnels</u>, No. C03-0689 CRB, 2003 WL

1   22939239, *6 (N.D. Cal. Dec. 5, 2003) (evidence of gang-affiliation admitted at petitioner's

2   murder trial did not violate due process because the jury could draw a permissible inference from

3   the evidence with respect to motive and intent); see also Aguilar v. Alexander, 125 F.3d 815, 820

4   (9th Cir. 1997) (in a murder prosecution, evidence of petitioner's involvement in drug dealing

5   was properly admitted as relevant to his motive in connection with the killing).  Because the jury

6   at petitioner's trial could draw permissible inferences from the gang membership evidence,

7   admission of that evidence did not violate petitioner's right to due process.  See Jammal, 926

8   F.2d at 920.  Accordingly, petitioner is not entitled to relief on this claim.

9                2.  Firearms Evidence

10               Petitioner also claims that the trial court's admission into evidence of the firearms

11  found in Hung Nguyen's car violated his right to a fair trial.  (Traverse at 1.)  The California

12  Court of Appeal concluded that petitioner had waived this issue because of the failure of his trial

13  counsel to make a contemporaneous objection when the evidence was admitted.  Respondent

14  argues that the state court's ruling in this regard constitutes a procedural bar precluding this court

15  from addressing the merits of this claim.

16               State courts may decline to review a claim based on a procedural default.

17  Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977).  As a general rule, a federal habeas court "'will

18  not review a question of federal law decided by a state court if the decision of that court rests on

19  a state law ground that is independent of the federal question and adequate to support the

20  judgment.'"  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996)

21  (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  The state rule for these purposes is

22  only "adequate" if it is "firmly established and regularly followed."  Id.  (quoting Ford v.

23  Georgia, 498 U.S. 411, 424 (1991)).  See also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir.

24  2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and

25  consistently applied.")  The state rule must also be "independent" in that it is not "interwoven

26  with the federal law."  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan

1   v. Long, 463 U.S. 1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the

2   claims may be reviewed by the federal court if the petitioner can show:  (1) cause for the default

3   and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to

4   consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at

5   749-50.

6          Respondent has met his burden of adequately pleading an independent and

7   adequate state procedural ground as an affirmative defense.  See Bennett, 322 F.3d at 586.

8   Petitioner does not deny that his trial counsel did not raise a contemporaneous objection to the

9   admission of evidence of weapons not used in the commission of the murder.  In addition,

10  petitioner has failed to meet his burden of asserting specific factual allegations demonstrating the

11  inadequacy of California's contemporaneous-objection rule as unclear, inconsistently applied or

12  not well-established, either as a general rule or as applied to him.  Bennett, 322 F.3d at 586;

13  Melendez v. Pliler, 288 F.3d 1120, 1124-26 (9th Cir. 2002).  Petitioner's claim is therefore

14  procedurally barred.  See Coleman, 501 U.S. at 747; Harris v. Reed, 489 U.S. 255, 264 n.10

15  (1989); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  Petitioner has failed to

16  demonstrate that there was cause for his procedural default or that a miscarriage of justice would

17  result absent review of the claim by this court.  See Coleman, 501 U.S. at 748; Vansickel v.

18  White, 166 F.3d 953, 957-58 (9th Cir. 1999).  The court is therefore precluded from considering

19  the merits of this claim.

20         Even were this claim not procedurally barred, it lacks merit and should be rejected.

21  A habeas petitioner is not entitled to relief based on constitutional trial error unless he shows

22  actual prejudice, or that the error "'had substantial and injurious effect or influence in determining

23  the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v.

24  United States, 328 U.S. 750, 776 (1946)).  For the reasons set forth by the California Court of

25  Appeal in affirming petitioner's conviction, it cannot be said that there is any reasonable

26  probability that evidence of petitioner's possession of other firearms not used in the murder

38

1   influenced the outcome of this case.  Accordingly, petitioner is not entitled to relief on this claim.

2          Evidentiary rulings by state courts normally do not raise federal constitutional

3   issues.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  In order to be cognizable under 28

4   U.S.C. § 2254, the error of state law must be so egregious that it amounts to a violation of the

5   Fourteenth Amendment's Due Process Clause.  Pulley v. Harris, 465 U.S. 37, 41 (1984).  The

6   error must render the trial fundamentally unfair.  Estelle, 502 U.S. at 72-73.

7          Even clearly erroneous admissions of evidence that render a trial fundamentally

8   unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly

9   established Federal law," as set forth by the Supreme Court.  28 U.S.C. § 2254(d).  In cases where

10  the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent

11  to find a state court ruling unreasonable.  Carey v. Musladin, 549 U.S. 70, 77, 127 S.Ct. 649

12  (2006).

13         Here, the state appeals court found no error of state law in the trial court's

14  evidentiary rulings.  After review of the record herein, this court finds no violation of the Due

15  Process Clause of the Fourteenth Amendment in connection with any of the trial court rulings

16  challenged herein.  This aspect of petitioner's third claim for relief should be denied.

17         For all of the above reasons, the state court's rejection of petitioner's third claim

18  for relief was neither contrary to, nor an unreasonable application of, controlling principles of

19  United States Supreme Court precedent.  Petitioner's third claim for relief should be denied.

20                 D.  Fourth Claim

21         Petitioner's fourth claim is that the evidence introduced at his trial was insufficient

22  to support his conviction as an aider and abettor on the charges of the murder of Andy Tran and

23  the attempted murder of Sen Dang.  The California Court of Appeal rejected this argument,

24  reasoning as follows:

25  /////

26  /////

**A.   The Murder Convictions of Len and Nhat Are Supported by Substantial Evidence**

We turn first to Nhat and Len's contentions over the sufficiency of the evidence of their murder convictions.

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator. (§ 31.)" (*Prettyman, supra*, 14 Cal.4th at p. 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

" 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating, or encouraging commission of a crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409, 30 Cal.Rptr.2d 525.) While neither presence at the scene of a crime nor knowledge of, but failure to prevent the crime, is sufficient to establish aiding and abetting (*ibid.*), " '[t]he presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding and abetting. . . .' " (*People v. Moore* (1953) 120 Cal.App.2d 303, 306, 260 P.2d 1011.) Further, an unarmed aider and abettor may be responsible in the same degree as the actual perpetrator. (*People v. Perkins* (1951) 37 Cal.2d 62, 64, 230 P.2d 353.)

In this case, the jury found Si guilty of the first degree murder of Andy. Defendants Len and Nhat were tried solely in their capacity as aiders and abettors. To convict Len and Nhat of first degree murder, the jury had to find that they knew of Si's criminal intent and intended to facilitate Si's intended crime.[21] (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.)

Whether Len and Nhat possessed the requisite criminal intent poses a question of fact, to which we apply the usual appellate standard of review:  "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence -- i.e., evidence that is credible and of solid value-from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Green* (1980) 27 Cal.3d 1, 55, 164 Cal.Rptr. 1, 609 P.2d 468, *disapproved on other grounds in People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3, 226 Cal.Rptr. 112, 718 P.2d 99, and *People v. Martinez* (1999) 20 Cal.4th 225, 239, 83 Cal.Rptr.2d 533, 973 P.2d 512; see also *People*

---

[21]  Defendants do not dispute that Si's conviction for Andy's murder is supported by substantial evidence.

*v. Johnson* (1993) 6 Cal.4th 1, 38, 23 Cal.Rptr.2d 593, 859 P.2d 673.)  We do not ask whether this court could have been persuaded by the evidence beyond a reasonable doubt, but whether " any rational trier of fact" could have been.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573]; see *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192, 27 Cal.Rptr.2d 695.)  This same standard applies to the review of circumstantial evidence.  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138, 17 Cal.Rptr.2d 375, 847 P.2d 55.)

Applying these principles to the present case, we conclude that substantial evidence supports the jury's determination that Len and Nhat knew that Si intended to shoot Andy, that they intended to facilitate, aid, or promote the commission of that offense, and that they in fact did so.

First, the manner of Andy's killing is indicative of premeditation and deliberation by all four defendants.  According to witnesses both inside and outside the Phan house, mere seconds elapsed between the time the front door opened, and Si shot and killed Andy.  The speed and effectiveness with which this was accomplished suggests that it represented the execution of a prearranged plan.  (See *People v. Hawkins* (1995) 10 Cal.4th 920, 957, 42 Cal.Rptr.2d 636, 897 P.2d 574 [the manner of killing may provide sufficient evidence of premeditation and deliberation, even where evidence of planning and motive are minimal], disapproved on a different point in *People v. Lasko* (2000) 23 Cal.4th 101, 110, 96 Cal.Rptr.2d 441, 999 P.2d 666.)

Second, there was evidence that all of the defendants participated in the planning and promotion of the crime. When defendants' initial attempt to locate Andy was unsuccessful, Si collected Nhat and Kiet the very next morning and went to the Phan house. He did so at a time when the three defendants would expect Len to soon join them and when Andy was also expected to be at or near the Phan house. The lapse of a day between Len's fight with Andy the previous day and the defendants' confrontation with Andy at the Phan house provided an opportunity to plan the attack and to obtain a weapon. Moreover, when Len did join the other three defendants, the four conferred briefly. Given the coordination between all four defendants over a 24-hour period and their conferring just before the attack, it would be highly unlikely that Si only communicated with Kiet about his plans.

Third, Kiet brought with him a gun when defendants went to the Phan house, which he immediately gave to Si, thus demonstrating that he and Si had previously communicated about the need for lethal force. But the jury was also entitled to infer from Nhat's presence with Si and Kiet in the car, and from Len's conference with the other defendants outside the Phan house before the shooting, that Nhat and Len also knew that Kiet had the gun. (See *People v.*

*Godinez* (1992) 2 Cal.App.4th 492, 500, 3 Cal.Rptr.2d 325.)
Indeed, it would be less reasonable to conclude that Nhat and Len
had no idea that Si would be armed, despite the fact that the
defendants had conferred right before the shooting and Si had
started shooting seconds after the front door opened.  That is, it
would be less reasonable to believe that the four defendants would
make plans to retaliate against Andy and go to the Phan house's
front door, but that two of the four would not advise the other two
what they had planned.

For this reason, Len's argument that "all of the evidence . . .
surrounding the shooting indicated that the gun appeared without
warning right before Si began to shoot" actually undermines his
claim that there was no premeditation.  The speed with which the
shooting was executed, and the coordination necessary to execute
the plan so quickly (the handoff of the gun from Kiet to Si), created
a reasonable inference that the lethal attack on Andy had been
planned.

Fourth, the likelihood that Len and Nhat were aware that Kiet or
Si had a gun is bolstered by the fact that Si and Kiet had a large
arsenal of weapons.  The size of such an arsenal suggests that Len
and Nhat had to be aware that the other two defendants possessed
weapons.  We thus reject Len's contention that "[n]one of the
evidence of the events immediately preceding the shooting provided
any basis for concluding that Len knew, or reasonably should have
known, that one of his companions was armed, much less that Si
intended to commit an assault with a firearm or a homicide."

Fifth, Nhat argues that his handling of the murder weapon after
the shooting "appears to have been no more than an immediate
reaction to an unfolding event, rather than any indication of prior
agreement to participate in a killing," but the fact that Si would
hand the gun to him suggests that he was part of the plan to kill
Andy.  Why would Si give the gun to someone not part of the
conspiracy?  Why not continue to carry the gun himself?

Sixth, Len and Nhat clearly had a motive to assist in the lethal
attack on Andy.  After all, it was Len's fight with Andy that
precipitated the retaliation.  Indeed, even Len concedes that "[i]t is
reasonable to infer from this evidence that Len intended to engage
in another round of combat with Andy."  And Nhat had a motive as
a fellow gang member to assist Si.

Seventh, all defendants were at the scene of the crime.  Although,
as noted, their mere presence would not, by itself, warrant a finding
that they aided and abetted the shooting (*People v. Campbell, supra,*
25 Cal.App.4th at p. 409, 30 Cal.Rptr.2d 525),[22] it was evidence to

_____

[22] The jury was correctly instructed on this point pursuant to CALJIC No. 3.01.

be considered in determining whether defendants were guilty of aiding and abetting. (*People v. Moore, supra,* 120 Cal.App.2d at p. 306, 260 P.2d 1011.) Moreover, defendants did not just happen upon the crime scene by chance. Rather, their collective presence in this case suggested that they intended to provide organized support for Si's attack on Andy.

Eighth, defendants' actions after the shooting demonstrate their consciousness of guilt, in that defendants fled together, hid together, and were picked up together. (See *People v. Williams* (1997) 55 Cal.App.4th 648, 652, 64 Cal.Rptr.2d 203 (*Williams IV*) [generally, evidence that a defendant fled the scene of a crime is admissible evidence of his consciousness of guilt].)[23] In addition, the trier of fact was entitled to conclude that by removing the murder weapon from the crime scene and initially hiding it, Nhat intended to facilitate the crime by making it more likely that defendants would escape detection.

Finally, there was the evidence of defendants' affiliation with MAC. The statements to police of Nhat, Si, and Si's girlfriend allowed the conclusion that Andy's shooting was gang-related. MAC, with which Nhat, Si, and Si's friends were affiliated, was unfriendly with those gangs with which Andy and his friends were believed to be affiliated. Even mere acquaintances knew that relations between defendants, on the one hand, and Andy and his friends, on the other, were unfriendly. In addition, the existence of these gang antagonisms and the arsenal of arms maintained by Si and Kiet made it more likely that a retaliation against a member affiliated with an unfriendly gang would be lethal. (Cf. *U.S. v. Garcia* (9th Cir.1998) 151 F.3d 1243, 1246 [Evidence of gang membership alone may not substitute for evidence of intent to establish liability for aiding and abetting where the facts do not demonstrate a coordinated effort with a specific illegal objective in mind].)

Len argues that "[t]he primary defect in the gang evidence is that it fails to show any previous conduct on the part of the gang or its members that would have alerted a reasonable person in Len's position to the likelihood that they would view Len's dispute with Andy Tran as an occasion calling for the use of lethal force." Len also argues that there was no evidence indicating that Len knew Kiet or was aware of his arsenal of weapons. But it is difficult to believe that Len would choose to contact Si for assistance against Andy but be wholly unaware of his gang affiliation or his possession or access to weapons. It is also difficult to believe that although Len conferred with Si, Kiet, and Nhat before they went to the Phan house, Len had no idea that Kiet would hand Si a gun and

/////

---

[23] The jury was instructed on this point with CALJIC No. 2.52.

that Si would start shooting within seconds after the front door was opened.

In light of the foregoing, we will not second-guess the jury.  We conclude that there was substantial evidence from which a reasonable trier of fact could have found Len and Nhat guilty as aiders and abettors of Andy's murder.

**B.  Defendants' Convictions For The Attempted Murder Of Sen Dang Are Based On Substantial Evidence**

Defendants contend that the evidence was insufficient to support their convictions for the attempted murder of Sen Dang.  Kiet argues that "there was no direct evidence suggesting that the shooter had an intent to kill Sen Dang" and that "the circumstantial evidence proves only that Sen Dang was accidentally hit by a stray bullet fired during the gun battle."

The Attorney General responds that "[g]iven the fact that Si fired at least five shots into the house, it is also inferable that [his] plan was not necessarily confined to killing Andy."  Further, he argues that "even assuming that the other [defendants] intended only to kill or shoot Andy, they are still liable for attempted murder as aiders and abettors under the 'natural and probable consequences' doctrine."

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."  (§ 21a; *People v. Toledo* (2001) 26 Cal.4th 221, 229, 109 Cal.Rptr.2d 315, 26 P.3d 1051; see 1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Elements, § 53, p. 262.)  Accordingly, "'''[s]pecific intent to kill is a necessary element of attempted murder.  It must be proved, and it cannot be inferred merely from the commission of another dangerous crime.'' [Citation.]'  [Citations.]"  (*People v. Swain* (1996) 12 Cal.4th 593, 605, 49 Cal.Rptr.2d 390, 909 P.2d 994; accord, *People v. Bland* (2002) 28 Cal.4th 313, 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (*Bland*).)

Thus, to find Si guilty of attempted murder, the jury had to find that Si intended to kill Sen Dang.  With respect to the other defendants, their "culpability for attempted murder as an aider and abettor necessarily depends on the commission of that crime by the perpetrator."  (*People v. Patterson* (1989) 209 Cal.App.3d 610, 614, 257 Cal.Rptr. 407; see *People v. Mendoza*, *supra*, 18 Cal.4th at p. 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.)  As noted earlier, they must "'"act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission, of the offense.'"  (*Mendoza*, at p. 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.)  But "[o]nce the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also

of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense." (*Ibid.*)

For purposes of our analysis of the sufficiency of the evidence for attempted murder, we will first focus on whether there was evidence upon which a rational trier of fact could conclude that Si intended to kill Sen Dang.  The jury was correctly instructed with CALJIC No. 8.66 that express malice is a prerequisite to a verdict of attempted murder.

Nonetheless, the California Supreme Court has recently ruled in *Bland, supra*, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107, that although the doctrine of transferred intent does not apply to attempted murder, "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.'"  There, the defendant – a member of a gang – shot at three persons in a vehicle, killing his target (a rival gang member who was driving) and injuring, but not killing, the two passengers (who were not gang members).  The California Supreme Court upheld the attempted murder convictions of the two passengers, which the Court of Appeal had reversed.  It found that "a person who shoots at a group of people [can] be punished for the actions towards everyone in the group even if that person primarily targeted only one of them" (28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107), that the intent to kill a particular target does not preclude finding a concurrent intent to kill others within the "kill zone" (*ibid.*), and that "[t]his concurrent intent theory is not a legal doctrine requiring special jury instructions such as is the doctrine of transferred intent" but rather "is simply a reasonable inference the jury may draw in a given case."  (28 Cal.4th at p. 331, fn. 6, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)  It added that "a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Ibid.*)  It then found in that case that "the evidence . . . virtually compelled a finding that, even if defendant primarily wanted to kill [the gang member], he also, concurrently, intended to kill the others in the car.  At the least, he intended to create a kill zone." (*Id.* at p. 333, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)

On the basis of *Bland, supra*, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, we conclude that there was sufficient evidence for the jury to conclude that Si possessed the requisite specific intent to kill others within the kill zone necessary to shoot Andy.  After all, he fired at least five shots into a crowded room.  Analogizing the car with two passengers in Bland with the crowded room of five people here, the jury was entitled to find that Si had a concurrent intent to murder – and shot with knowledge that he would kill – anyone who was near his target when he sprayed the room with five gunshots.

We next turn to the sufficiency of the evidence supporting the convictions of the other defendants as aiders and abettors.

"Accomplice liability is 'derivative,' that is, it results from an act by the perpetrator to which the accomplice contributed." (*Prettyman, supra*, 14 Cal.4th at p. 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.) "When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' [Citation.]" (*Ibid.*)

Admittedly, there was no direct evidence that the other defendants knew that Si would spray the room with bullets in order to kill Andy, thereby creating a "kill zone."

But there was sufficient evidence under the natural and probable consequences doctrine.  The natural and probable consequences doctrine is "based on the recognition that 'aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.' [Citation.]" (*Prettyman, supra*, 14 Cal.4th at p. 260, 58 Cal.Rptr.2d 827, 926 P.2d 1013.) The test of natural and probable consequences is an objective one and """depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." [Citation.]' [Citations.]" (*People v. Culuko* (2000) 78 Cal.App.4th 307, 327, 92 Cal.Rptr.2d 789.)

A reasonable person would have foreseen that the reasonably foreseeable consequence of shooting into a crowded room to murder one person would be to murder any innocent bystander within the "kill zone." (*Bland, supra*, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) And clearly, the jury could reasonably infer that defendants were aware that there were a number of people at the Phan house, including Andy, who could be hit in the line of fire. Further, in light of the evidence that the attack on Andy was an aspect of gang warfare, "[t]he frequency with which . . . gang attacks result in homicide" supported the foreseeability that an attempt to murder one person in an occupied home would result in the murder (or if they survived, the attempted murder) of others. (See *People v. Montano* (1979) 96 Cal.App.3d 221, 227, 158 Cal.Rptr. 47 [Defendant's conviction for attempted murder depended upon the determination that a codefendant's assault with intent to commit murder was a natural and probable consequence of an attack on rival gang member].)  In short, if Si was properly convicted of the attempted murder of those within the kill zone pursuant to *Bland, supra*, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, so, too, were his aiders and abettors since such a kill zone was the natural and probable consequence of the premeditated murder of Andy in a crowded room.  This is but a direct application of the natural and probable consequences doctrine, which declares:

1
2
3

     "'[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets.'" (*Prettyman, supra*, 14 Cal.4th at p. 261, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

4

     Accordingly, there was sufficient evidence to support defendants' convictions for attempted murder.

5    (People v. Tran, et al., slip op. at 48-61.)

6        The Due Process Clause of the Fourteenth Amendment "protects the accused

7    against conviction except upon proof beyond a reasonable doubt of every fact necessary to

8    constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There

9    is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

10   favorable to the prosecution, any rational trier of fact could have found the essential elements of

11   the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also

12   Prantil, 843 F.2d at 316.  "[T]he dispositive question under Jackson is 'whether the record

13   evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v.

14   Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  "A petitioner for

15   a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the

16   evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408

17   F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the federal habeas court must find that

18   the decision of the state court reflected an objectively unreasonable application of Jackson and

19   Winship to the facts of the case. Id. at 1275 & n.13.

20        The court must review the entire record when the sufficiency of the evidence is

21   challenged in habeas proceedings. Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

22   vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

23   the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

24   reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.  If the trier of

25   fact could draw conflicting inferences from the evidence, the court in its review will assign the

26   inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

1    relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

2    the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th Cir.

3    1991).  Thus, "[t]he question is not whether we are personally convinced beyond a reasonable

4    doubt" but rather "whether rational jurors could reach the conclusion that these jurors reached."

5    Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines

6    sufficiency of the evidence in reference to the substantive elements of the criminal offense as

7    defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

8            Viewing the evidence in the light most favorable to the verdict, and for the reasons

9    described by the California Court of Appeal, the undersigned concludes that there was sufficient

10   evidence from which a rational trier of fact could have found beyond a reasonable doubt that

11   petitioner was guilty of the murder of Andy and the attempted murder of Sen Dang.  As explained

12   by the state appellate court, there was evidence introduced at petitioner's trial indicating that Si

13   intended to kill whoever was in the house, or at least whoever stood in the way of Andy.  There

14   was also substantial evidence that the murder of persons other than Andy was a reasonably

15   foreseeable consequence of the attempt by petitioner and his co-defendants to murder Andy.

16           The evidence adduced at trial supports the prosecution's theory that petitioner and

17   his co-defendants met the day before and devised a plan to avenge Len for his fight with Andy.

18   Petitioner was seen with Si and Kiet outside the victim's house the day before the murder.  (RT

19   3558-59.)  On the day of the murder, petitioner, Si and Kiet arrived at the victim's house.  It

20   appeared they were waiting for Andy to come home in order to confront him, and were also

21   waiting for Len to join them.  These actions support a finding of shared intent.

22           The evidence demonstrates that Kiet quickly handed Si the gun and Si fired the gun

23   shortly after arrival.[24]  This also supports an inference that at a minimum, Si and Kiet shared a

24   _____

25       [24]  Kiet's lawyer argued that Nhat gave the gun to Si, not Kiet.  (RT 4100.)  But he also
     argued that Si brought the gun, that the evidence did not demonstrate Kiet gave Si the gun, and
26   that petitioner, a good friend of Si, had at his house the bag that held the 9 mm gun.  (RT 4109.)

1    common plan to commit an armed assault.  Petitioner approached the house with Si and Kiet and,

2    because of the prior acts of lying in wait, support the jury's finding that petitioner was part of the

3    plan.  The evidence of gang membership by petitioner and Si also supports this finding.  Petitioner

4    thought Andy and other people inside the victim's house were members of a rival gang.  (RT

5    2438, 2454-56, 3671.)  As gang members, Si and petitioner would have been aware of the danger

6    involved in confronting rival gang members in their own home.  This gang membership raises an

7    inference that Si and Kiet would inform petitioner ahead of time about the presence of the gun and

8    their intent to use it.

9          Petitioner's actions after the shooting also support the jury's finding that petitioner

10    shared Si's intent.  Petitioner took the gun from Si shortly after the shooting and hit it in a

11    backyard.  (RT 2440.)  Petitioner and his three co-defendants ran to Si's car to escape after the

12    shooting, and when the car wouldn't start, they all fled together.  (RT 931-32, 1180-82.)  The four

13    of them hid together until their friend, Hung, came to pick them up, and they all left together in

14    Hung's car.  (RT 3267-68; 2000-01.)

15          But even if petitioner did not hold the specific intent to murder Andy or attempt to

16    murder Sen Dang, the facts support a finding that he aided and abetted an armed assault, the

17    natural and probable consequence of which was first degree murder and attempted murder under

18    California law.  The attempted murder charge is further supported by the fact that Si shot at least

19    five rounds into the crowded room.  As noted by respondent, the act of firing a single bullet in the

20    direction of two people can be sufficient to support convictions on two counts of attempted

21    murder.  People v. Chinchilla, 52 Cal.App.4th 683, 690 (1997).

22          The state court opinion rejecting petitioner's argument in this regard is a

23    reasonable construction of the evidence in this case and is not contrary to or an objectively

24    unreasonable application of federal law.  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002); see

25    also 28 U.S.C. § 2254(d)(1).  Accordingly, petitioner is not entitled to habeas relief on his claim

26    /////

1    that the evidence introduced at his trial was insufficient to support his conviction on the charge of

2    murder and attempted murder.

3          The state court's rejection of petitioner's fourth claim for relief was neither

4    contrary to, nor an unreasonable application of, controlling principles of United States Supreme

5    Court precedent.  Petitioner's fourth claim for relief should be denied.

6          E.  <u>Fifth Claim</u>

7          Petitioner claims that because the trial court allowed the prosecution to present

8    evidence of an unredacted videotape police interview with codefendant Si, his Sixth Amendment

9    right to confrontation and his right to due process were violated.  Petitioner argues that certain

10    comments made by the detectives during the interview should have been redacted.  Specifically,

11    petitioner claims that (1) the jury was improperly allowed to hear the detectives tell Si that they

12    thought no jury would believe his self-defense claim, (2) the detectives' statements misled the jury

13    to believe petitioner and the other defendants had attacked Si's credibility and refuted Si's self-

14    defense claim, and (3) the detectives' statements "implied to the jury that evidence of

15    [petitioner's] guilt was being withheld from them."  (Pet. at 11-13.)

16          The California Court of Appeal rejected petitioner's arguments:

17        **C.**     **The Admission of Si's Unedited Interview with Police Was Not an**
                  **Abuse of Discretion**

18

19       After Si testified at trial, the trial court permitted the prosecution
      to introduce a videotape of the police's interview of Si on the night

20     of the shooting. The jury was also provided a written transcript of
      the interview.

21       In so doing, the trial court overruled defendants' objection

22       pursuant to Evidence Code section 352 that the videotape and
      transcript should be redacted to omit questions posed, or statements

23       made, by interviewing officers, in which they discredited Si's
      description of the shooting. Those statements by interviewing

24       officers included statements (1) that they did not believe Si had shot
      in self-defense, and neither would a jury; (2) that people in the

25       neighborhood had identified Si as the shooter; and (3) that
      codefendants had stated that Si had carried the murder weapon into
      the Phan house.

26

On appeal, defendants contend that the trial court abused its discretion in refusing to require redaction of those statements. They argue that the officers' statements constituted inadmissible, unsworn, opinion testimony on Si's credibility and also "operated like an Aranda[25] violation, permitting the prosecution to 'smuggle in by inference claims that could not be argued openly and legally.'" [26] These contentions fail for three reasons.

1.

First, there was no prejudice from the inclusion of the officers' statements because the trial court admonished the jury that the statements by the officers were not evidence. Specifically, the jury was instructed: "In considering the evidence of the statements made by Si Van Dang during the videotape[d] interrogation, you're instructed that any alleged statement of facts made by the officers during the interrogation are not to be considered by you as evidence. Only Si Van Dang's responses are evidence that may be used against him and/or any other defendant." The court also instructed the jury more generally with CALJIC No. 1.02 that "[a] question is not evidence" and that it must not "assume to be true any insinuation suggested by a question asked a witness." We may presume the jury followed those instructions. (*People v. Adcox* (1988) 47 Cal.3d 207, 253, 253 Cal.Rptr. 55, 763 P.2d 906.) The jury would therefore not have used the officers' statements as evidence or inferred from the officers' questions that the officers had evidence not introduced at trial that contradicted Si. (See *People v. Kimble* (1988) 44 Cal.3d 480, 498-499, fn. 14, 244 Cal.Rptr. 148, 749 P.2d 803.)

2.

Second, when the interview is viewed in its full context, it is extremely doubtful that the jury would have perceived the officers' questions or statements to be evidence prejudicial to defendants' case. For example, although the officers suggested at one point that they had learned from Nhat, Kiet, and Len that Si himself carried the gun into the Phan house, they later indicated that only Len had been interviewed, implicitly undermining the previous assertion.

---

[25]  *People v. Aranda* (1965) 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265 (Aranda).

[26]  Defendants also contend for the first time on appeal that Si's interview should have been excluded in its entirety because it was largely consistent with his trial testimony, and thus that it did not constitute impeachment evidence (Evid.Code, § 1235).  That argument is waived. A defendant may not claim on appeal that evidence is inadmissible on a ground that is not urged in a specific and timely objection in the trial court.  (*People v. Clark* (1992) 3 Cal.4th 41, 125-126, 10 Cal.Rptr.2d 554, 833 P.2d 561.)  Defendants' assertions that such an objection was made after the tape was played for the jury fails.  That objection was not only untimely, but merely claimed that "the entire tape was not impeachment." (Emphasis added.)

And by the end of the trial, it was uncontested that Kiet had given Si the gun. Thus, there could have been no prejudice from the inclusion of that statement by officers.

Similarly, as to the officers' statements that neighbors had identified Si as the shooter, it is unlikely that the jury would have concluded that the prosecution possessed evidence that was not introduced at trial. After all, the prosecution presented testimony of individuals from the neighboring area who identified Si as the shooter. And Si himself admitted that he was the shooter. There was no prejudice here.

Finally, in the portion of the interview transcript to which Si's counsel objected and in which the officers suggested a jury would not believe him, the police officers disparaged, not Si's claim of self-defense, but his claim that he did not know where the murder weapon came from:

"[Officer] Ragsdale: I'm, I'm, I'm telling you, I'm telling you, nobody's gonna believe that story that a gun appeared in my hands and I snatched it out of somebody else's hand and, and I took off with it but I don't know what happened. And it just disappeared and I don't know what happened.

"[Si] Dang: I don't where it go. All I do, all I know is like, he shot at me and I just hold the gun and shot him back or something.

"Ragsdale: But listen to your own story.

"[Si] Dang: I did, for real, whenever I tell it then, they can. . . .

"Ragsdale: If I sat here and told you that same story, would you believe me?

"[Si] Dang: Well, I don't know, I never been a detective before, so.

"Ragsdale: Well, you don't have to be a detective. You're not gonna have . . . you're not gonna have twelve detectives on the stand, they're gonna have twelve people that live in your community. And they're gonna sit there and say, well, he, he got a gun and he doesn't know where it came from. It just appeared in his hand."

Moreover, since Si himself abandoned at trial his initial assertion that he did not know where the gun came from, the fact that officers expressed skepticism over that contention could not have been prejudicial.

/////

Admittedly, elsewhere, the officers disparaged Si's claim of self-defense.[27] But even if defendants had objected to that part of the interview, the probative value of retaining the full context of the interview outweighed any prejudice. After all, there could be no prejudice from the jury's hearing the officers' dismissal of his claim of self-defense where it corresponded with the government's position in the case, was made at the early stages of the investigation, and was not supported by a reference to any specific evidence. It was a bare assertion clearly designed to probe Si's reaction. The court properly determined that in light of its instruction to the jury (to disregard the officers' statements as evidence), there was a greater risk in misleading the jury by removing the questions and statements to which Si responded, which would have removed the context in which his answers were given. In any event, defendants do not cite any portion of the record that shows a specific objection to this portion of Officer Ragsdale's interview; thus, the objection is waived.

3.

Finally, defendants' argument that the officers' statements "operated like an Aranda violation, permitting the prosecution to 'smuggle in by inference' " codefendants' statements contradicting Si also fails.

It is true that during the interrogation, Officer Ragsdale said, "Is there any reason that all three of these people are saying that you pulled the gun from your jacket?"

But the jury was instructed that "[o]nly Si Van Dang's responses are evidence which may be used against him and/or any other defendant." Furthermore, it was uncontested by the end of the trial

---

[27] In that regard, the following dialogue took place at the interview:

"[Si] Dang: Well, all, all I know is uh, self-defense. The gun is not me. It's not for me. It doesn't belong to me, I don't know who the gun belongs to.

"[Officer] Ragsdale: You know, the more, the more I look at this and the more that you're, I'm listening to your story, self-defense just isn't gonna fly. I mean, you're making up this stuff about guns and stuff. As far as I'm concerned, and as far as what they're gonna hear on the jury stand, they're gonna hear you making up stuff about, oh yeah, self-defense, I saw a gun but. . . .

"[Officer] Salsedo: See what, . . .

"[Si] Dang: I offered to tell you guys, one of the guys was carrying a gun, that's all I'm gonna tell you guys."

53

that Kiet gave Si the gun. Thus, there could be no prejudice from
the erroneous factual assumption in this question.

   In sum, we find that the trial court reasonably could determine
that the probative value of the unexpurgated version of Si's
interview outweighed any potentially prejudicial effect. Any
prejudice was not only constrained by the court's instruction not to
consider the officers' statements as evidence, but we conclude that
the jury would not have relied on anything that the officers said in
that interview in coming to a verdict.

(People v. Tran, et al., slip op. at 42-48.)

   The Confrontation Clause of the Sixth Amendment guarantees a criminal

defendant the right "to be confronted with the witnesses against him."  U.S. CONST. amend. VI.

   Admission of evidence infringes upon due process rights only when "there are *no*

permissible inferences the jury may draw from the evidence. . . ."  Jammal v. Van de Camp, 926

F.2d 918, 920 (9th Cir. 1991).

   The admission of this evidence did not violate the Confrontation Clause.  Si Dang

testified at trial and petitioner's defense counsel cross-examined him.  Moreover, the two

detectives who interviewed defendant Si were available for cross-examination.  However, it

appears petitioner chose not to recall the detectives for cross-examination.  Both detectives were

called as witnesses and both were subject to recall.  Thus, petitioner's right to confront witnesses

was not violated and the state courts properly rejected this claim.

   Petitioner has failed to demonstrate that the jurors would perceive the detectives'

statements as factual assertions of evidence.  After a review of the record, the undersigned

concludes that the introduction of the unredacted videotape did not render petitioner's trial

fundamentally unfair.  As described by the Court of Appeal, the evidence was highly probative

with respect to the charges against petitioner.

/////

/////

/////

1    The record also reflects the trial judge specifically instructed the jury to ignore any

2  alleged statements of facts made by these detectives.[28]  (RT at 3841.)  The jury is presumed to

3  have followed these instructions.  Penry v. Johnson, 532 U.S. 782, 799, 121 S. Ct. 1910 (2001).

4    The state court's rejection of petitioner's fifth claim for relief was neither contrary

5  to, nor an unreasonable application of, controlling principles of United States Supreme Court

6  precedent.  Petitioner's fifth claim for relief should be denied.

7       F.  Sixth Claim

8          1.  Jury Instruction Error:  Lying in Wait

9    Petitioner claims that the trial court improperly instructed the jury on the theory of

10  lying in wait.  (Pet. at 13-14.)  Petitioner argues that the state court's rejection of this claim was

11  unreasonable because the evidence showed petitioners made no effort to conceal their presence

12  from the occupants of the house.  (Pet. at 13.)

13    The California Court of Appeal rejected this argument, reasoning as follows:

14     B.  The Court Did Not Err in Instructing on "Lying in Wait"

15     Over the objection of defense counsel, the trial court instructed
    the jury on the alternative theories of first degree murder of (1)
16    murder by premeditation and deliberation and (2) murder by lying in
    wait.

17
     In connection with lying in wait, the trial court instructed the jury,
18    in part, as follows: "Murder which is immediately preceded by lying
    in wait is murder of the first degree.  [¶]  The term 'lying in wait,' . .
19    . is defined as a waiting and watching for an opportune time to act[,]
    together with a concealment by ambush or some other secret design
20    to take the other person by surprise even though the victim is aware
    of the murderer's presence.  [¶]  The lying in wait need not continue
21    for any particular time provided its duration is such to show a state
    of mind equivalent to premeditation or deliberation.  [¶] . . . [¶]  In
22    the crime of murder by lying in wait[,] a necessary element is the
    existence in the mind of a defendant of a concealed purpose or plan
23    to surprise the victim."

24  ────────────────

25    [28]  The trial court stated, "In considering the statements made by Si Van Dang during the
  videotape interrogation, you're instructed that any alleged statement of facts made by the officers
  during the interrogation are not to be considered by you as evidence.  Only Si Van Dang's
26  responses are evidence that may be used against him and/or any other defendant."  (RT 3841.)

Defendants contend that the instruction "was error because it was not supported by sufficient evidence and was given special emphasis by the court's late reading to the jury. . . ."  We disagree.

Defendants first assert, as they argued at trial, that the prosecution did not provide the defense with advance warning that this theory would be proffered because it was requested on the day before the court read the instructions to the jury and only given after the court reconvened the following week.  Citing *Sheppard v. Rees* (9th Cir. 1990) 909 F.2d 1234 (*Sheppard*), defendants contend on appeal that they were afforded constitutionally inadequate notice of the prosecution's lying-in-wait theory, and that *Sheppard* requires reversal.

In *Sheppard, supra*, 909 F.2d 1234, the Ninth Circuit granted habeas corpus relief on the ground that the defendant had received constitutionally inadequate notice of the prosecution's felony-murder theory, stressing that "[a]t no time during pretrial proceedings, opening statements, or the taking of testimony was the concept of felony-murder raised, directly or indirectly." (*Id.* at p. 1235.)  Felony-murder instructions were requested for the first time on the morning after the jury instructions conference.  (*Ibid.*)  The Ninth Circuit reversed the conviction, concluding that it could not "regard as fair a trial in which the defendant's right to defend was impaired by a lack of notice as to the nature and cause of the accusation." (*Id.* at p. 1238.)

*Sheppard, supra*, 909 F.2d 1234, is not dispositive here.  First, California courts have observed that *Sheppard* is not binding on us (*People v. Crawford* (1990) 224 Cal.App.3d 1, 8, 273 Cal.Rptr. 472) and "cannot be squared with binding California Supreme Court authority." (*People v. Scott* (1991) 229 Cal.App.3d 707, 716-717, 280 Cal.Rptr. 274, citing *People v. Murtishaw* (1981) 29 Cal.3d 733, 751, fn. 11, 175 Cal.Rptr. 738, 631 P.2d 446, *disapproved on other grounds* in *People v. Boyd* (1985) 38 Cal.3d 762, 772-773, 215 Cal.Rptr. 1, 700 P.2d 782; *People v. Thomas* (1987) 43 Cal.3d 818, 829, fn. 5, 239 Cal.Rptr. 307, 740 P.2d 419; *People v. Witt* (1915) 170 Cal. 104, 148 P. 928.)

In addition, *Sheppard* has been limited to its facts.  (909 F.2d 1234.)  There, the prosecutor waited until after the instructions had been settled to raise the possibility of proceeding on the felony-murder theory, and the felony underlying the felony-murder theory "did not figure prominently in the trial." (*People v. Crawford, supra*, 224 Cal.App.3d at p. 8, 273 Cal.Rptr. 472.)  But here, the facts underlying the prosecution's theory of lying in wait were squarely presented, and the instruction was requested during the instructions conference.  Moreover, unlike the felony-murder rule, which is an alternative to the usual elements of murder, "[l]ying in wait is the functional equivalent of proof of

/////

56

premeditation, deliberation, and intent to kill." (*People v. Stanley* (1995) 10 Cal.4th 764, 794-795, 42 Cal.Rptr.2d 543, 897 P.2d 481.)

Accordingly, where, as here, the instruction is the functional equivalent of that which defendant has been given notice, where the prosecutor requests instructions on his theory of lying in wait along with his other instructions, and where, as here, the factual basis of the theory has been central to the prosecution's theory, no ambush of the sort found objectionable in *Sheppard* has occurred. (See *People v. Gurule* (2002) 28 Cal.4th 557, 629-630, 123 Cal.Rptr.2d 345, 51 P.3d 224; *People v. Gallego* (1990) 52 Cal.3d 115, 189, 276 Cal.Rptr. 679, 802 P.2d 169, *cert. den.* (1991) 502 U.S. 924 [112 S.Ct. 337, 116 L.Ed.2d 277]; *Morrison v. Estelle* (9th Cir.1992) 981 F.2d 425, 428.)

On the merits, defendants argue that the court erred in instructing the jury on lying in wait because there was no evidence that they concealed themselves so as to surprise Andy and "they did not hide the vehicle and assume a hidden position waiting for Andy Tran" after arriving at the Phan house.

That defendants did not secrete themselves is not fatal to a finding that the instruction was justified. Lying in wait requires that the murder be "committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. . . ." (*People v. Morales* (1989) 48 Cal.3d 527, 557, 257 Cal.Rptr. 64, 770 P.2d 244; see also *People v. Stanley, supra,* 10 Cal.4th at p. 795, 42 Cal.Rptr.2d 543, 897 P.2d 481.)

Accordingly, the element of concealment is satisfied by a showing """"that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim."""" (*People v. Sims* (1993) 5 Cal.4th 405, 432-433, 20 Cal.Rptr.2d 537, 853 P.2d 992 [emphasis added], *disapproved on another point* in *People v. Storm* (2002) 28 Cal.4th 1007, 1031-1032, 124 Cal.Rptr.2d 110, 52 P.3d 52; see, *e.g., People v. Tuthill* (1947) 31 Cal.2d 92, 100-101, 187 P.2d 16 [although victim was aware of defendant's physical presence prior to attack, necessary elements of "waiting, watching, and secrecy all were present"]; *People v. Byrd* (1954) 42 Cal.2d 200, 208-209, 266 P.2d 505 [defendant waited in front of his former wife's home, then entered it, conversed with her, and shot her], *disapproved on other grounds* in *People v. Morse, supra,* 60 Cal.2d at pp. 648-649, 36 Cal.Rptr. 201, 388 P.2d 33.)

Mindful of our duty "to determine whether there is evidence to support the instruction, not scour the record in search of evidence suggesting a contrary view" (*People v. Ceja, supra*, 4 Cal.4th at p. 1143, 17 Cal.Rptr.2d 375, 847 P.2d 55), we conclude that the

1
2
3
4
5
6
7

evidence supported the lying-in-wait instruction. The defendants disguised their purpose not only by hiding the murder weapon in Kiet's pants, but by allowing Andy to pass unmolested into the Phan house, from which Andy might conclude that defendants did not intend to lethally hurt him and be off guard. Indeed, not knowing defendants had a gun, Andy might have felt safe in the presence of others in the Phan house. Defendants then waited for Len to join them. With the advantage of all members, defendants went into the Phan house and shot Andy within seconds. From this evidence, the jury could reasonably conclude that defendants concealed their murderous intention and struck from a position of surprise and advantage, factors that are the hallmark of a murder by lying in wait.

8
9
10
11
12
13
14

We also reject defendants' contention that the timing of the giving of this particular instruction prejudicially "subjected [it] to special scrutiny by the jury." Defendants have provided us with no authority for the proposition that the mere timing of giving this jury instruction could constitute prejudicial error, and their reliance on *People v. Valenzuela* (1977) 76 Cal.App.3d 218, 142 Cal.Rptr. 655, is misplaced. Indeed, *Valenzuela* states that the timing of instructing a jury is a matter within the sound discretion of the trial judge. (*Id.* at p. 221, 142 Cal.Rptr. 655.) Further, here, the jury received the standard instruction to disregard the order in which the instructions were given (CALJIC No. 1.01), which we may presume was heeded. (*People v. Adcox, supra*, 47 Cal.3d at p. 253, 253 Cal.Rptr. 55, 763 P.2d 906.)

15  (People v. Tran, et al., slip op. at 70-75.)

16      A challenge to jury instructions does not generally state a federal constitutional

17  claim. See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle v. Isaac, 456 U.S. at 119);

18  Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). Habeas corpus is unavailable for

19  alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see

20  also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378,

21  1381 (9th Cir. 1986). However, a "claim of error based upon a right not specifically guaranteed

22  by the Constitution may nonetheless form a ground for federal habeas corpus relief where its

23  impact so infects the entire trial that the resulting conviction violates the defendant's right to due

24  process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d

25  1107 (9th Cir. 1980)). See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To

26  prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the

1   entire trial that the resulting conviction violates due process.")  The analysis for determining

2   whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is

3   similar to the analysis used in determining, under Brecht, 507 U.S. at 623, whether an error had "a

4   substantial and injurious effect" on the outcome.  See McKinney v. Rees, 993 F.2d 1378, 1385

5   (9th Cir. 1993).

6            In order to warrant federal habeas relief, a challenged jury instruction "cannot be

7   merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

8   process right guaranteed by the fourteenth amendment." Prantil, 843 F.2d at 317 (quoting Cupp v.

9   Naughten, 414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate the

10  challenged jury instructions "'in the context of the overall charge to the jury as a component of the

11  entire trial process.'"  Prantil, 843 F.2d at 317 (quoting Bashor v. Risley, 730 F.2d 1228, 1239

12  (9th Cir. 1984)).  The United States Supreme Court has cautioned that "not every ambiguity,

13  inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."

14  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly ambiguous

15  instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has

16  applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at

17  72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  See also United States v. Smith, 520

18  F.3d 1097, 1102 (9th Cir. 2008).

19           The state appellate court's conclusion that the giving of a jury instruction on lying

20  in wait did not violate petitioner's right to a fair trial is not contrary to or an unreasonable

21  application of the federal due process principles set forth above and should not be set aside.  As

22  explained by the state appellate court, there was substantial evidence to support each of the

23  elements of murder by lying in wait as that crime is defined in California law.  Under the

24  circumstances presented here, where petitioner and his co-defendants waited until the opportune

25  time to surprise and kill Andy in his friend's house, and the presence of a gun was concealed, a

26  jury instruction on murder by lying in wait did not render petitioner's trial fundamentally unfair.

1    Further, as explained by the state appellate court, this case is distinguishable from the situation

2    presented in <u>Sheppard v. Rees</u>, 909 F.2d 1234, 1236 (9th Cir. 1990).  In that case, the government

3    conceded that its conduct affirmatively misled the defendant by switching to a different theory of

4    criminal liability at the last minute, thereby ambushing him and denying him an effective

5    opportunity to prepare a defense.  For the reasons set forth in the state court's opinion, that was

6    not the case here.  Accordingly, petitioner is not entitled to relief on this claim.

7                    2.  <u>Jury Instruction Error:  Transferred Intent</u>

8                    Petitioner claims that it was error for the trial court to instruct the jury on the

9    theory of murder involving transferred intent because it allowed the jury to transfer the intent to

10   kill Andy to Sen.  (Pet. at 14.)  Petitioner also argues that the transferred intent instruction likely

11   confused jurors because it was given immediately preceding the instruction on attempted murder.

12   This placement likely caused the jury to mistakenly apply the transferred intent instruction to Sen.

13                    The California Court of Appeal rejected this argument, reasoning as follows:

14            Defendants suggest that the sufficiency of the evidence here might
         be infected with an erroneous instruction. They argue (incorrectly in
15       light of *Bland, supra,* 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d
         1107) that "[i]n light of the conceded absence of intent to kill Sen
16       Dang, the only possible way that the jury could have found
         [defendant] guilty of attempted murder here is if it transferred to
17       Sen Dang its finding of Si Dang's intent to kill Andy. . . ." Claiming
         that the transferred intent doctrine was inapplicable where the
18       intended victim was killed, they complain that the court gave an
         instruction on transferred intent pursuant to CALJIC No. 8.65, and
19       that it was given "immediately preceding the attempted murder
         application [ sic ], which likely confused the jury and caused it to
20       mistakenly apply it to Sen Dang."

21            However, the trial court's instruction on transferred intent was
         given as part of the court's instructions on murder and manslaughter
22       and correctly stated: "When one attempts to kill a certain person but
         by mistake or inadvertence kills a different person, the crime, if any,
23       so committed is the same as if the person originally intended to be
         killed had been killed." Thus, by its own terms, the instruction
24       would not have confused the jury on the attempted murder charge
         because it only applied to a person who was killed, not a person
25       (like Sen Dang) who was only injured.

26   /////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

      In *Bland, supra*, 28 Cal.4th at page 332, 121 Cal.Rptr.2d 546, 48 P.3d 1107, the California Supreme Court rejected a similar argument that CALJIC No. 8.65 misled the jury into believing that a finding of premeditation concerning the killing of the driver could be transferred to the wounding of the passengers in the car: "CALJIC No. 8.65, as the court gave it, refers to a mistaken killing, but not to injuries.  Although labeled the 'transferred intent' instruction, it does not actually use that term.  It merely tells the jury, correctly, that if the defendant killed the wrong person, the killing constituted the same crime as if the intended person had been killed. . . .  It did not allow the jury to transfer intent to someone who is only injured." Thus, the trial court's instruction with CALJIC No. 8.65 here did not affect the attempted murder finding.FN24

      FN24. We also reject defendants' argument that CALJIC No. 8.65 served no purpose here. It was Cuong Phan who purportedly challenged Si directly and moved toward him first.  Further, Si testified that he returned fire into the house because Len was trapped there.  Thus, there was evidence that Si might be targeting others.  Indeed, Nhat concedes that "there is evidence supporting the defense case that this was not a one-sided premeditated killing, but rather a confrontation between the parties that escalated into an armed altercation between Si and Cuong. . . ."  And defendants' argument that the prosecutor did not discuss the concept of transferred intent in the context of Si shooting Andy does not alter the standard for giving instructions applicable to the evidence. (*People v. Benson* (1990) 52 Cal.3d 754, 799, 276 Cal.Rptr. 827, 802 P.2d 330.)  Further, the jury received the standard instruction to disregard any instruction which it found to be unsupported by the evidence (CALJIC No. 17.31), and we presume the jury heeded this instruction. (*People v. Adcox* (1988) 47 Cal.3d 207, 253, 253 Cal.Rptr. 55, 763 P.2d 906.)

21  (People v. Tran, et al., slip op. at 61-63.)

22        As noted above, in order to warrant federal habeas relief, a challenged jury

23  instruction must violate some due process right, and is evaluated in the context of all the jury

24  instructions taken together.  Prantil, 843 F.2d at 317.  However, some instructional errors are so

25  serious that they amount to "structural defects, which defy analysis by harmless error standards."

26  Suniga v. Bunnell, 998 F.2d 664, 667 (9th Cir.1993)(internal citations omitted) (state trial court

1   erroneously instructed jury on felony-murder when the prosecution's only theory was malice

2   aforethought, and culpability under felony-murder did not exist.)  See also Martinez v. Garcia,

3   379 F.3d 1034 (9th Cir. 2004) (structural error where Martinez was convicted under two

4   conflicting instructions, one proper and one erroneous, and where it was impossible to tell from

5   the verdict form whether he was convicted on the basis of premeditation (permissible theory) or

6   transferred intent (impermissible theory).)

7         In California, the doctrine of transferred intent is available as a defense.  People v.

8   Levitt, 156 Cal.App.3d 500, 507, 203 Cal.Rptr. 276 (1984), superseded by statute on other

9   grounds, People v. Browning, 233 Cal.App.3d 1410, 1413, 285 Cal.Rptr. 216 (1991).  "Under this

10  doctrine, just as 'one's criminal intent follows the corresponding criminal act to its unintended

11  consequences,' so too one's lack of criminal intent follows the corresponding non-criminal act to

12  its unintended consequences.  Thus, a defendant is guilty of no crime if his legitimate act in

13  self-defense results in the inadvertent death of an innocent bystander."  Id. (citations omitted).

14        In the instant case, the jury was instructed as to deliberate and premeditated murder

15  and as to transferred intent:

16      CALJIC 8.20  DELIBERATE AND PREMEDITATED MURDER

17       All murder which is perpetrated by any kind of willful, deliberate
    and premeditated killing with express malice aforethought is murder
18      of the first degree.

19       The word "willful," as used in this instruction, means intentional.

20       The word "deliberate" means formed or arrived at or determined
    upon as a result of careful thought and weighing of considerations
21      for and against the proposed course of action.  The word
    "premeditated" means considered beforehand.
22
     If you find that the killing was preceded and accompanied by a
23      clear, deliberate intent on the part of a defendant to kill, which was
    the result of deliberation and premeditation, so that it must have
24      been formed upon pre-existing reflection and not under a sudden
    heat of passion or other condition precluding the idea of
25      deliberation, it is murder of the first degree.

26  (CT 1358.)

1          CALJIC 8.65   TRANSFERRED INTENT

2              When one attempts to kill a certain person, but by mistake or
          inadvertence kills a different person, the crime, if any, so committed
3          is the same as though the person originally intended to be killed,
          had been killed.

4

5   (CT 1363.)

6          The state appellate court's conclusion that the giving of a jury instruction on

7   transferred intent did not violate petitioner's right to a fair trial is not contrary to or an

8   unreasonable application of the federal due process principles set forth above and should not be

9   set aside.  As the appellate court explained, the jury instruction is specifically directed to the

10  victim ultimately killed.  Because Andy was killed, not Sen, it was not possible for the jury to

11  apply this instruction to Sen.  The prosecution did not argue that the jury should apply a

12  transferred intent theory to find defendants guilty of attempted murder.  Petitioner has failed to

13  demonstrate that it is likely that the jury misapplied this instruction or that they were confused by

14  it.

15         Petitioner's argument concerning the placement of this instruction prior to the

16  attempted murder instruction fails for the same reason.  The order that the jury instructions were

17  read to the jury was appropriate.  The instruction preceding the transferred intent instruction

18  defined homicide.  (RT 1363.)  It states that "[t]o constitute murder or manslaughter there must

19  be, in addition to the death of a human being, an unlawful act which was a cause of that death."

20  (RT 1363.)  The transferred intent jury instruction followed the homicide instruction and applies

21  only to an actual homicide.

22         To the extent petitioner argues there was insufficient evidence to support the giving

23  of a transferred intent instruction, the record reflects otherwise.  Moreover, this case is

24  distinguishable from Suniga and Martinez on its facts.  Although the prosecution maintained the

25  target of the assault or murder was Andy, there was evidence adduced at trial that Cuong Phan

26  may have been the target.  After petitioner and his co-defendants entered the house, Cuong Phan

63

1 said, "Get the fuck out of my house."  Melinda Esquejo testified that Cuong ran out of the house

2 with a pistol and fired several shots as he chased petitioner and his co-defendants around the

3 corner.  (RT 2777-79.)  The defense view of the evidence was the shooting resulted from an

4 armed altercation between Si and Cuong.  Under this scenario, the jury would have applied the

5 transferred intent instruction to find Si intended to kill Cuong, but hit Andy instead.  This

6 application could have resulted in the jury finding Si liable for murder under a transferred intent

7 theory, or, if the jury believed Si shot at Cuong in self-defense, it could have acquitted Si under

8 that theory.  See People v. Levitt, 156 Cal.App.3d at 507.

9           Here, the jury's verdict showed that it rejected Si's self-defense theory.  The jury

10 found petitioner and his co-defendants guilty of first degree murder of Andy and the attempted

11 murder of Sen.  (CT 1246-48; 1269-70; 1311-12; 1332-33.)

12           The state court's rejection of petitioner's sixth claim for relief was neither contrary

13 to, nor an unreasonable application of, controlling principles of United States Supreme Court

14 precedent.  Petitioner's sixth claim for relief should be denied.

15           G.  Seventh Claim

16           Finally, petitioner argues that all of the alleged errors claimed by petitioner

17 demonstrate cumulative error warranting reversal of his conviction.

18           The California Court of Appeal rejected this claim, as follows:

19           The litmus test in assessing the cumulative effect of errors "is
           whether [petitioner] received due process and a fair trial." (People
20         v. Kroneyer (1987) 189 Cal.App.3d 314, 349.)  [The court has]
           rejected many of [petitioner's] contentions, finding no error.  [The
21         court] believe[s] the few isolated instances of error . . . found did
           not affect the fairness of the trial, either individually or taken
22         together.  "A defendant is entitled to a fair trial, not a perfect one."
           (People v. Mincey (1992) 2 Cal.4th 408, 454.)  Long criminal trials
23         are rarely perfect.  (Hill, supra, 17 Cal.4th at p. 844.)  But the trial
           judge here showed admirable patience and made herculean efforts,
24         including repeated continuances, to give defendants a fair trial.
           Defendants received that fair trial.

25

26 (People v. Tran, et al., slip op. at 108.)

                                    64

1          The cumulative error doctrine in habeas recognizes that, "even if no
2       single error were prejudicial, where there are several substantial
        errors, 'their cumulative effect may nevertheless be so prejudicial as
       to require reversal.' " Killian v. Poole, 282 F.3d 1204, 1211 (9th
3       Cir.2002) (quoting United States v. de Cruz, 82 F.3d 856, 868 (9th
       Cir.1996)).  In the absence of a specific constitutional violation,
4       habeas review of trial error is limited to whether the error "so
       infected the trial with unfairness as to make the resulting conviction
5       a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637,
       643 (1974).  A habeas court may not grant the writ on the basis of
6       errors of state law whose combined effect does not violate the
       Federal Constitution.  Lewis v. Jeffers, 497 U.S. 764, 780 (1990);
7       Pulley v. Harris, 465 U.S. 37, 41 (1984).

8  Parle v. Runnels, 387 F.3d 1030, 1045 (9th Cir. 2004).

9          However, where there is no single constitutional error existing, nothing can

10  accumulate to the level of a constitutional violation.  See Mancuso v. Olivarez, 282 F.3d 728, 745

11  (9th Cir.2002); Fuller v. Roe, 182 F.3d 699, 704 (9th Cir.1999); Rupe v. Wood, 93 F.3d 1434,

12  1445 (9th Cir.1996).

13          As noted above, this court finds petitioner has suffered no constitutional violation,

14  so there is nothing to accumulate.  This claim must also fail.

15          For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

16  application for a writ of habeas corpus be denied.

17          These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

19  days after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties.  Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

22  /////

23  /////

24  /////

25  /////

26  /////

1  failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED:  November 12, 2009.

4

5                                              UNITED STATES MAGISTRATE JUDGE

6

7  001; nguy1829.157

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26